JAGMIN, Appellant, v. SIMONDS ABRASIVE COMPANY, Respondent.

*No. 173. Argued October 1, 1973.—Decided November 12, 1973.*
(Also reported in 211 N. W. 2d 810.)

Keeton, *Creative Continuity in the Law of Torts*, 75 Harv. L. Rev. (1962), 463, 506, 509.

For the appellant there was a brief and oral argument by *Larry W. Rader* of Wausau.

For the respondent there was a brief by *Genrich, Terwilliger, Wakeen, Piehler & Conway, S. C.,* of Wausau, and oral argument by *Walter H. Piehler.*

WILKIE, J. Three issues are raised on this appeal:

1. Was there sufficient evidence to support the special verdict?

2. Is the plaintiff 50 percent negligent as a matter of law?

3. Are the damages awarded inadequate?

*Sufficiency of the evidence.*

The trial court directed a verdict for the defendant because it concluded that the plaintiff had failed to meet his burden of proof. The elements which must be proven to establish liability under the theory of strict liability were set forth in *Dippel v. Sciano* [1] in which case Rule 402A of the Restatement of Torts was adopted in this state. The plaintiff must prove (1) that the product was in a defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the seller engaged in the business

---

[1] (1967), 37 Wis. 2d 443, 155 N. W. 2d 55.

of selling such product and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was in when he sold it. The trial court here specifically found that there was failure to prove a defect existed when the grinding wheel left the seller's control and also ruled that the proof on causation was also lacking.

We have repeatedly held that a cause should be taken from the jury and a verdict directed against a party only when the evidence gives rise to no dispute as to the material issues or only when the evidence is so clear and convincing as reasonably to permit unbiased and impartial minds to come to but one conclusion. If there is any evidence other than mere conjecture or incredible evidence to support a contrary verdict, the case must go to the jury.[2]

"Nevertheless, the plaintiff in a tort case does have the burden of proof and, in meeting this burden, he must come forward with evidentiary facts that establish the ultimate facts; and the degree of proof must be such as to remove these ultimate facts from the field of mere speculation and conjecture. . . . A jury cannot be allowed to merely theorize negligence from what might be a mere possibility." [3]

All authorities recognize that in a products liability case the plaintiff must establish that there was a defect in the defendant's product, but "defect" has been defined on a case-by-case basis and has not been susceptible of any general definition.[4] The question of what amount of evidence is sufficient to establish a defect is one of first impression in Wisconsin. The trial court held here in effect that the mere circumstances of the wheel break-

[2] *Eden v. La Crosse Lutheran Hospital* (1971), 53 Wis. 2d 186, 191 N. W. 2d 715.

[3] *Zillmer v. Miglautsch* (1967), 35 Wis. 2d 691, 700, 151 N. W. 2d 741.

[4] Annot. (1967), 13 A. L. R. 3d 1057, 1078, sec. 6 (b).

ing did not give rise to a reasonable inference that it was defective in light of the fact that it had been used for some period of time before the accident. The trial court stated:

"It is undisputed that whatever wheel Mr. Jagmin was using at the time of the accident had been used for some period of time. If the wheel examined by the defendant was in fact the wheel that caused the injuries, it clearly was used to such a point that one might have very well argued that its worn out condition caused Mr. Jagmin's injuries. Be that as it may, no expert testimony was offered nor can any inference be made in this court's opinion from the statement in the report that any defect existed in any wheel that caused Mr. Jagmin's injuries."

An article in the Insurance Law Journal discussed the problem of proving defects in products.[5] The author stated that mere proof that the product exploded or disintegrated and an injury resulted may not be enough. He suggested that testimony may be presented to prove by:

". . . (1) direct evidence of an expert the specific defect; (2) circumstantial evidence, through use of expert opinion, the specific defect which caused the product failure; (3) direct evidence, of the user and other eyewitnesses, of product failure or malfunction, supported by expert-opinion evidence that any one of several actual or probable or possible causes constitutes a defective condition either of manufacture or design; (4) inferential evidence of a defect by negating other probable causes."

Here the trial court was correct in deciding that the plaintiff did not produce expert testimony to give an opinion on possible causes of the breakage of the wheel. Since the wheel had been destroyed after the industrial commission hearing through the fault of neither party,

[5] Emanuel Emroch, *Pleading and Proof in a Strict Products Liability Case,* 1966 Insurance Law Journal, 581.

the plaintiff could not offer any direct expert evidence based on an examination of the wheel. The plaintiff did call adversely James Price, who was head of the defendant's laboratory which tested the ingredients in the manufacturing process and examined products returned as defective. Plaintiff's counsel had Price describe the process by which the grinding wheels in question are manufactured. It involves a complex measuring and mixing process and counsel apparently hoped to show at what points problems could arise which would result in defects in the finished product. In counsel's questioning of Price, the most he drew out was that the company was concerned about the "controlled density of the wheel" and that a pressing machine is supposed to control that, although some wheels were hand pressed. Nothing was elicited as to the result of a variation in density.

Thus the plaintiff's case rests mainly on the inference that no breakage of the wheel would occur without a defect. This inference would be similar to the inference of negligence under the theory of *res ipsa loquitur*. The trial court in this case felt that this was not a reasonable inference, given the fact that the wheel had been used for a certain period of time before the accident.

This position was taken in several cases (all from other states) cited by the defendant. In *D'Allesandro v. Edgar Murray Supply Co.*[6] the court found no evidence of an original defect in a grinding stone which broke and struck the operator and killed him. The stone was used for sharpening knives and had been delivered on August 9, 1962, and used until the accident on September 24, 1962. The court said:

"The wooden shipping crate in which the stone was packed was undamaged. The stone itself, the sides of which were clearly visible through the slats of the crate, appeared undamaged and without visible defect. There is no evidence of any sort tending to establish the exis-

---

[6] (La. 1966), 185 So. 2d 34, 36.

tence of any sort of defect in the stone prior to its delivery to deceased. The very fact that the stone had been used by the deceased before its disintegration to the extent that four inches were worn off the diameter of the stone is an indication of the fact that the stone was not defective when received by him. There is no evidence of what happened to the stone during the period from August 9, 1962, when it was received by deceased, and September 24, 1962, when it disintegrated, other than the fact that it had been used and worn to the extent of four inches off of the diameter."

In *Markwell v. General Tire and Rubber Co.*[7] the court held it was proper to grant a directed verdict for the defendant where an examination of an allegedly defective tire which had collapsed and caused plaintiff's car to overturn failed to show any leaks and the tire had been on the plaintiff's car seven months. This court even made statements that it felt a *res ipsa loquitur* type inference would not be appropriate because the manufacturer had no control over the tire at the time of the accident. The court felt that there was no more probability that the tire had any defect when it left the manufacturer's possession than that it had been subsequently created.

In *State Stove Mfg. Co. v. Hodges,*[8] the court held that where a contractor did not install recommended pressure valves on a hot water heater, the product did not reach the consumer without substantial change. But the court also added:

"Moreover, there is no evidence to show that the heater, as manufactured by appellant, was in a defective condition and unreasonably dangerous. Thermostats are mechanical in nature, not safety appliances, and the evidence reflects the obvious fact that all mechanical devices may fail at one time or another. The mere fact that they locked in the 'on' position does not suffice to show that the thermostats were defective when manufactured. Any mechanical contrivance may fail to work.

---

[7] (7th Cir. 1966), 367 Fed. 2d 748.

[8] (Miss. 1966), 189 So. 2d 113, 123.

Their failure to function after the lapse of seven months of use does not indicate a defect at the time the heater left the manufacturer. . . ."

But an Illinois case realized that the requirement that a defect must exist when it leaves the control of the manufacturer does not mean the defect must manifest itself at once. In *Dunham v. Vaughan & Bushnell Mfg. Co.*,[9] the Illinois Supreme Court held that whether a hammer which injured the plaintiff when a chip from the face of the hammer broke off and struck the plaintiff in the eye was defective was a question for the jury. The hammer in this case had been used for eleven months. Both sides offered expert testimony of a metallurgist and neither found any flaws in forging or any defects due to the process of manufacture. Both experts said that use will make it more likely to chip or shear because work hardening can cause metal failure. There was no evidence of misuse. The court summarized the evidence as showing that a new hammer is unlikely to chip but that after some period of use work hardening might make chipping a reasonable expectation and part of the hammer's likely performance. The court realized that problems arise in the middle range. How long should a manufacturer be liable for his product? The Illinois court decided the answer was for the jury and that in this case the jury could reasonably conclude that the hammer failed to perform in the manner that would reasonably have been expected and that this failure caused plaintiff's injuries.

Although *Dunham* does not use the term *res ipsa loquitur*, it appears that the analysis of the problem would lend itself to that doctrine. Some jurisdictions do speak of *res ipsa* in connection with inferring a defect from circumstantial evidence. The case of *Jakubowski v.*

[9] (1969), 42 Ill. 2d 339, 247 N. E. 2d 401.

*Minnesota Mining and Mfg.*[10] is very similar on its facts to the case at bar. In *Jakubowski* the plaintiff brought an action against the defendant manufacturer of an allegedly defective abrasive disc which broke and struck the plaintiff while he was using it in the course of employment. The plaintiff was an experienced operator. He had replaced another operator on the line and had not put a new disc on the machine. The extent of prior use did not appear and the broken disc was not produced at trial nor was it examined as to cause of breakage. The plaintiff testified that the discs broke often.

The court discussed the *res ipsa loquitur* doctrine with regard to inferences of negligence, and indicated that it could apply where the instrumentality leaves the control of the defendant if the plaintiff shows it was not improperly handled or otherwise changed. Then it went on to discuss inferences of defects.

". . . While a manufacturer is liable on its warranty irrespective of negligence, nevertheless it is necessary for the plaintiff to show that the dangerous condition which he contends constitutes a breach of warranty had its genesis when the instrumentality was within the control of the manufacturer. Accordingly, in the absence of direct evidence that the product is defective because of a manufacturing flaw or inadequate design, or other evidence which would permit an inference that a dangerous condition existed prior to sale, it is necessary to negate other causes of the failure of the product for which defendant would not be responsible, in order to make it reasonable to infer that a dangerous condition existed at the time the defendant had control." [11]

In *Jakubowski* the court found the plaintiff had shown he was properly using the abrasive disc at the time it broke but that that was not enough. An inference of probability and not mere possibility was needed and the

---

[10] (1964), 42 N. J. 177, 199 Atl. 2d 826.

[11] *Id.* at pages 183, 184.

court felt it was just as probable that the prior user or use beyond normal span was responsible. (The court said it was common knowledge that abrasives wear out.) The plaintiff had not negated these possibilities. He apparently made no offer of proof at all. The court went on to say:

". . . There are industrial operations which involve a certain degree of hazard no matter how carefully the operation is engineered and even though the most adequate tools available are used. And it cannot be said that responsibility for industrial accidents should fall on the manufacturer of the tool, rather than the employer who has selected the tool and engineered the operation, merely because the tool breaks.
". . .
". . . When a product can be damaged in the course of use and thereby become unreasonably dangerous, we cannot hold its manufacturer liable in warranty for the mere failure of the product in the absence of evidence tending to show that the product was not mishandled or used beyond its reasonably expected life span after it left the manufacturer's hands." [12]

The use of *res ipsa* principles in a strict liability case was again well discussed in *Franks v. National Dairy Products Corp.*[13] That case involved the explosion of hot fat which burned the plaintiff. The plaintiff was about to pick up a container of hot fat which had been drained from a deep fat cooker. The defendant claimed the explosion must have been caused by water on the bottom of the can vaporizing and causing the fat to spew out. The plaintiff testified that the container was dry when the fat began to drain and the court so found.

The court indicated that it was aware of the " 'corner stone rule in products liability,' that 'proof of mere injury furnishes no rational basis for inferring that the

[12] *Id.* at pages 185, 186.
[13] (D. C. Texas 1968), 282 Fed. Supp. 528.

product was defective for its intended use.' " [14]   In *Franks* there were eyewitnesses to the explosion. However, no testimony identified any specific molecular condition of the fat as the defect which caused the explosion. Thus this again presented the problem of proof of a defective condition by the use of circumstantial inferences. The court said:

". . . This method of proof has long been permitted in negligence cases, under the doctrine of res ipsa loquitur, to allow the jury to infer negligence from an unexplained accident, provided certain factors were present. The Fifth Circuit recently reiterated the rule within the strict liability framework:

"[W]hen circumstantial evidence is the only proof, courts have infrequently inferred negligence (here a defect) simply from the accident and proof of careful conduct by the plaintiff, and then only in instances where the accident is the type which, standing alone, points an accusing finger at the maker. Helene Curtis Indus., Inc. v. Pruitt, 385 F. 2d 854. It is essential to the proving of a defect in that manner (where, as is nearly always the case, the product is in the hands of a user or consumer) that the plaintiff negative improper handling or use and that plaintiff negative causes of the accident other than the product's own defective condition." [15]

The court cited the *Jakubowski* case as support. Here the court found that the plaintiff had properly followed directions to strain the fat periodically and that the container was dry. Therefore, the possibilities of water or foreign matter causing the explosion were negatived and it was reasonable to infer the accident was caused by a defect in the product.

Thus a *res ipsa* type of inference is enough to establish a defect if the plaintiff can show that he was properly using the product and can negative other possible causes

[14] *Id.* at page 531.
[15] *Id.*

of the product failure since it left the manufacturer's control. Prosser has said that:

". . . He [plaintiff] need not negative entirely the possibility that the defendant's conduct was not a cause, and it is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not."[16]

Or as said in *Grinnell v. Charles Pfizer & Co.*,[17] the burden is on the plaintiffs to prove the product defective but not beyond a reasonable doubt. The plaintiffs only have to introduce evidence which affords a reasonable basis for the conclusion that it was more likely than not that conduct of the defendant manufacturer was a substantial factor in the injury.

In the instant case the plaintiff Jagmin testified that grinding wheels could be used down to one-half inch in thickness, and Price testified that the wheels were approximately two inches in thickness when new. Plaintiff testified that he had put a new wheel on the night before the accident and had used it not more than three quarters of an hour before quitting. He then used the wheel for about half an hour the morning of the accident. He testified that the wheel was about one and one-half inches thick and had at least four or five hours of grinding left on it. Jagmin then described how he had checked the wheel before beginning to grind as was customary among the operators. He testified that he checked the wheel visually to see if there were any obvious defects such as cracks or imperfections and then tested it while running to see if there were vibrations which would indicate an imbalance. Jagmin testified that he was just finishing off a casting so that he had only to remove any foreign matter clinging to the top flat surface. The foreman testified that this job indeed

---

[16] Prosser, *Law of Torts* (4th ed.), p. 242.
[17] (1969), 274 Cal. App. 2d 424, 79 Cal. Rptr. 369.

was the one of least stress to the wheel. The plaintiff described how he replaced grinding wheels on his machine, and no testimony was offered to show this was in any way mishandling. There was testimony that the wheels were stored in a locker and nothing was offered to show that they were improperly stored.

On cross-examination the plaintiff maintained that there was nothing unusual about the operation of the machine that morning and that he had only been grinding with the top of the wheel. Defense counsel tried to suggest that the machine was used at night by another shift and that therefore [18] the possibility of misuse by another was not eliminated. The fact that it had been used the night before was disputed. The foreman testified that there was a night crew but could not say that this particular machine was used. The plaintiff admitted there was a night crew, but denied that there was no way to tell whether the machine had been used after he left. He said he could be almost positive that it had not been used because at that time the night crew had been reduced and there were only three men on the night shift and that his casting was in the same place on his workbench in the morning. The night crew would move the day shift's work in order to use the benches. The plaintiff also said each booth had its own machines and tools so that it would not be probable that the machine was removed and used elsewhere and then returned.

Defense counsel then introduced testimony the plaintiff had given at the industrial commission hearing to impeach his own in-court testimony. At the hearing he had been asked if he knew how long the particular stone had been used. Jagmin answered:

"No, I don't. We have a night shift working on the 17th, the same time we were and they were using the

[18] *See Jakubowski, supra,* footnote 10.

same equipment. I can't tell you. I can say it was approximately a third worn down."

Then again defense counsel introduced a statement signed by the plaintiff which was taken by a representative of the employer's workmen's compensation carrier. In it the plaintiff was supposed to have said "It [the grinder] had been used by the night shift." And in response to a question by the representative as to why plaintiff had inspected the machine, the plaintiff was supposed to have said: "I inspected this wheel before I started using it and I could see no cracks or chips in it. The reason I inspected it was because the grinder was on the floor just below the rack where the night man should have put it but I am sure it didn't fall out. There is no way it can fall out because of the half moon shape of the rack." The plaintiff admitted signing the document but stated that the first remark was incorrect and if he had noticed it he would not have signed. The plaintiff said he might have made the second statement, but then the plaintiff admitted the grinder was on the floor the morning of the accident. He tried to explain that he was cleaning the booth and probably placed it there himself and that he inspected it for damage.

As for the condition of the equipment the foreman testified that he had not checked to see if the air power system was properly lubricated or whether the pressure was normal at the time of the accident. The plaintiff introduced a wheel breakage report made shortly after the accident by a sales representative (Mr. Olson) of the defendant. This report states the blotter on the wheel did not show slippage, or excessive flange tightening, or uneven pressure. The report further stated that the machine ran at a constant speed and that the wheel ran true and that the condition of the machine was "good." The report noted that the speed of the machine was measured to be 6,150 R.P.M., when the grinding wheel

recommended 6,050 R.P.M. Mr. Lemke, vice-president of manufacturing for plaintiff's employer, was present when the speed test was run and testified that the machine was running properly.

This is an exceedingly close case on the facts. There is no evidence to indicate either a machine malfunction or improper use by the plaintiff except perhaps in setting the portable grinder on the floor as he claims he did. The defense tried to show the machine was used by someone else (on the night shift) and so that the possibility of misuse had not been eliminated. We think, however, that this was a fact question for the jury and that they could have concluded that in fact no one had used the machine the night before the accident. The jury could also have concluded that the machine had not been dropped. Therefore, this case appears to be similar to the Illinois case of *Dunham v. Vaughan & Bushnell Mfg. Co., supra,* dealing with the hammer. Grinding wheels wear out, but plaintiff testified it had only been used for a short period and it should have been a jury question whether the accident was more probably due to a defect than to natural wear.

The grinding wheel was not produced at the trial because it had been destroyed after the workmen's compensation hearing. However, two wheel breakage reports were placed in evidence. The first was made by Olson when he picked up the wheel and the second was made when the wheel was received at the defendant's Philadelphia office. The plaintiff contends that the wheel examined in Philadelphia was not the wheel which injured him. This is based on discrepancies in the descriptions of the wheel contained in the two reports. The first report describes the wheel as 5 inches in diameter, 1³⁄₈ths inches thick, blotter diameter of 4 inches (blotter being the paper labeling on the wheel). This report also said there was one flange impression (a flange is similar to a washer in shape and holds the wheel on the ma-

chine) on the blotter—2¼th inches with a ⅝ths inch diameter relief. The second report describes a wheel 4⅞ths inches in diameter and $31\frac{1}{32}$nds of an inch thick. It also indicates a blotter diameter of 2³⁄₁₆ths inches and shows considerable damage. It further shows two sets of flange marks (a 2 inch diameter with a 1⁵⁄₁₆ths inch relief diameter; and a 2³⁄₁₆ths inch diameter flange with a 1¹⁄₁₆th inch diameter relief). The second report concluded that the wheel had been used on at least two different machines and was worn almost to discard size. It also indicated that the fracture lines on the wheel indicate it broke from a side impact blow and the wheel was bruised. Thus, if this was the same wheel the report would be consistent with defense contentions of misuse causing the breakage.

There is testimony that the alleged wheel took an unusually long period of time to reach the Philadelphia laboratory for the second test and report. There was also a difference in the identifying numbers on the two reports. Olson testified that he took the wheel back to his distributor, and personally packaged it to send to the defendant's branch office in Chicago. However, Olson did not tag or label the wheel in any way—the packing slip was on the outside of the package. Several photographs were introduced taken by Price in Philadelphia. No photographs were taken of the wheel when it was first picked up by Olson. The photographs show a tag on the wheel marked "machine tool, Minneapolis, Minnesota" with the number R451105. The number does not appear again in any of the reports. Olson, however, testified that the photographs fairly depicted the wheel he had received from Murray Machinery. The plaintiff offered to put on an expert to compare the reports and give his opinion that they described two different wheels, or at least that the continuity of the evidence had not been preserved. The trial court refused to permit the

testimony saying the jury should draw its own conclusions from the direct evidence. Even this expert, Mr. Skogan, admitted during the offer of proof that the breakage lines on the photographs were roughly compatible with what was in Olson's report. The defense tried to intimate that the discrepancies were due to measuring the thicknesses at various places. It also appears that masking tape with Jagmin's name on it was placed on the wheel after it left Olson's control. The masking tape appeared in the photographs taken at the Philadelphia laboratory.

There was a jury question as to whether the defendant had proved that the wheel which was examined in Philadelphia was the wheel originally given to Olson at the plant. The plaintiff wished to use the conclusion that the wheel examined was a different wheel to warrant an inference adverse to the defendant's contention of no defect. The plaintiff submitted the following requested jury instructions which the court refused to give:

"Evidence has been received in this case that the broken abrasive wheel was taken by the defendant's representative after the accident. It was the duty of Simonds Abrasive Company to keep and safeguard the broken grinding wheel. If you determine that Simonds Abrasive Company breached this duty and it was wholly their fault that the means of ascertaining the truth are not available, then you may infer from such conduct and circumstances alone that the wheel was defective and that such defect caused the injury to Harry Jagmin unless the defendant has offered you an explanation of the accident which is satisfactory to you.

"(Adapted from the rule in *Dimond v. Henderson*, [47] Wis. 172 and Wis J I Civil 1145 Res Ipsa Loquitur.)"

"Evidence has further been received in this case covering the wheel (which has also subsequently been destroyed, through no fault of either party) which the defendant relies on to support its claim that the wheel

which caused injury to the plaintiff, Harry Jagmin, was not defective. If you find that a grinding wheel was substituted under circumstances that Simonds Abrasive Company, their employees and agents, knew or should have known that it was not the wheel involved in the Jagmin accident and the defendant has failed to give you a satisfactory explanation of such conduct, then you may infer that such evidence, namely the grinding wheel, would have been unfavorable to the defendant's cause and that its defense is without foundation.

"(Adapted from 29 *Am. Jur.* 2d sec. 176 page 220, and Wis J I Civil [410] Witnesses: Absence.)"

The plaintiff clearly felt that if it could be shown that the wheel examined in Philadelphia and returned to Murray Machinery as the wheel which injured Jagmin was in fact a different wheel, then as a matter of law it should be presumed that there was a defect, by application of the maxim *omnia praesumuntur contra spoliatorem.*[19] This is not a correct statement of the law as concerns this maxim and its application. The trial court in its opinion on motions after verdict said:

"Finally the court believes it must reiterate that the mere fact that evidence in this case may or may not have been lost, does not create an inference of impropriety on the part of the defendant. In the absence of some specific showing that the defect was in existence which caused the defendant to secrete, misplace or hide the alleged exploding wheel, the court does not believe it can infer that either the defendant, Murray Mfg., or perhaps the plaintiff or employees of either the defendant or Murray Manufacturing Company disposed of, lost or hid the said wheel. The proof is lacking in this case to permit a finding of this sort but even if such were present this court is of the opinion that some showing of defect in this wheel must be offered by the plaintiff and such has not been done."

The trial court was entirely correct in its conclusion that the plaintiff had not proven to a reasonable cer-

[19] "All things are presumed against a despoiler or wrong doer." Blacks, *Law Dictionary* (4th ed.), at page 1238.

tainty by evidence which was clear, satisfactory and convincing [20] that the defendant intentionally destroyed, or fabricated evidence by substituting a second wheel. If the jury concluded that a second wheel was examined and sent back to Murray, it would only give rise to an inference of negligence in handling returned goods. If the defendant had a duty it was one of ordinary care which any voluntary bailee would owe to the bailor. There is no authority to indicate a higher duty because of the possibility of a future suit growing out of the breakage. Thus the question is whether negligent, rather than intentional, loss of evidence or negligent production of erroneous evidence gives rise to an adverse inference against the loser or producer and what the strength of this inference is.

In Wisconsin the operation of the maxim *omnia praesumuntur contra spoliatorem* is reserved for deliberate, intentional actions and not mere negligence even though the result may be the same as regards the person who desires the evidence.[21] Even if the conduct of the defendant would give rise to an adverse inference, the trial court was correct in concluding that this inference could not carry the plaintiff's burden of proof. It has been held that the fabrication of evidence is not itself evidence of the truth of the facts at issue and does not warrant an inference that the true facts are the opposite of those shown by the fabricated evidence.[22]

In its opinion on motions after verdict, the trial court also indicated it did not think any inference of the existence of a defect could reasonably be drawn from a statement made by Olson in his original breakage report. Olson had made a notation in answer to the ques-

[20] Wis J I—Civil, Part I, 210.
[21] *Dimond v. Henderson* (1879), 47 Wis. 172, 2 N. W. 73. *Cf. Knapp v. Edwards* (1883), 57 Wis. 191, 15 N. W. 140.
[22] 31A C. J. S., *Evidence,* p. 391, sec. 155.

tion on the form, "If there is any additional information available to help determine cause of accident or to prevent a recurrence, please give it here." The answer made by Olson was, "We started having this problem when we started supplying hard shell wheels. We have since gone back to the finished wheels." Although the statement is ambiguous and does not specify what "problem" is referred to, it is reasonable that the reference is being made to breakage of wheels since the statement appears in a wheel breakage report. It is not necessary that the remark specify a particular defect and that the plaintiff show that the wheel which injured him contained this defect. The inference drawn from Olson's answer may be weak, but it could be considered as part of plaintiff's attempt to meet his burden of proving a defect.

The trial court indicated in its opinion on motions after verdict that it had doubts whether the plaintiff had proved that his injuries were "caused by a wheel manufactured by the Simonds Abrasive Company." It is not clear whether the court was referring to causation alone or also to proof of manufacture. The defendant admitted the manufacture of the wheel in the pleadings. Causation is almost always an inference to be drawn from the circumstances. Although the plaintiff was unable to testify as to just what hit him, there is a reasonable inference that it was a piece of the broken wheel or something thrown up by a piece of the wheel. The grinding was done in booths with partitions between each operator so that debris would not be likely to have come from another operator's grinding operation. Also the plaintiff testified that he was doing a light finishing job so that it would be unlikely that a piece of metal from the casting was ground off and hit him. From these circumstances the jury could reasonably conclude that

the plaintiff's injuries were a result of the bursting wheel.

*Contributory negligence of the plaintiff.*

In *Dippel v. Sciano* [23] this court indicated that strict liability was similar to a finding of negligence per se and that it could be compared with the contributory negligence of the user of a defective product in apportioning responsibility for injuries caused by defective products. The jury in this case found that the grinding wheel was in a defective condition so as to be unreasonably dangerous to a prospective user when it left the possession of the defendant and that this defective condition was a cause of the plaintiff's injuries. The jury further found that the plaintiff was negligent with respect to his own safety but that such negligence was not a cause of the plaintiff's injuries.

The trial court in its opinion on motions after verdict indicated that apportionment of negligence must be changed from 100/0 to 50/50. The court said:

"Further the court believes that if it can by any stretch of the imagination be said that the requirements of *Dippel, supra,* have been met by the plaintiff, then, without any doubt, it must also be held that the plaintiff was contributorily negligent, at least to the extent that the defendant was at fault. Clearly the plaintiff wore no guard and operated the wheel without maintaining a proper guard on it. Comparing such negligence with the actions of the defendant, it would be impossible in this court's opinion to hold that the blame ought not to be equally divided."

The apportionment of negligence is peculiarly within the province of the jury and only in an unusual case will the court upset a jury's apportionment, particularly

[23] *Supra,* footnote 1.

where the negligence of each party is not of the same kind and character.[24] This court has also stated that it would set aside a jury's finding apportioning negligence only if at least one of three factors were present: (1) if as a matter of law the plaintiff's negligence equaled, or exceeded that of the defendant; (2) if the percentages attributed to the parties (in light of the facts) were grossly disproportionate; and (3) if there was such a complete failure of proof that the verdict could only be based upon speculation.[25] The trial court indicated that it felt the plaintiff must be held 50 percent negligent as a matter of law.

The testimony which could bear on the question of the plaintiff's negligence is as follows. The supervisor on the day of the accident, a Mr. Holfeldter, testified that he did not recall whether Murray Machinery had provided the plaintiff with any guard of any type and that he had not personally instructed him with respect to the use of any guard because he had not hired Jagmin so would not have instructed him. The foreman further testified that he did not believe any of the other operators were using guards, and that the nature of the work at the plant was such that a guard could not be used economically on all the jobs. But Holfeldter did indicate that there were some guards available for the type of work Jagmin was doing. These guards were in the foreman's locker and maintenance also had them. He did not prescribe a guard for Jagmin when he spoke to him shortly before the accident and he could not recall prescribing a guard for any of the work being done in his department at that time. On cross-examination the fore-

---

[24] *Williams v. Milwaukee & Suburban Transport Corp.* (1967), 37 Wis. 2d 402, 155 N. W. 2d 100.

[25] *Lautenschlager v. Hamburg* (1969), 41 Wis. 2d 623, 165 N. W. 2d 129; *Ernst v. Greenwald* (1967), 35 Wis. 2d 763, 151 N. W. 2d 706.

man did indicate that the use of guards was not unheard of at Murray's and that when he hired someone he did instruct them to use guards. The foreman also stated that every grinding wheel had a warning on it to always use a guard. The foreman also indicated that the men were instructed to use respirators and, in answer to a question from defendant's counsel, agreed that they performed a dual function—filtering air and furnishing some protection to the face.

Plaintiff's counsel brought out the fact that there was a determination made by the Wisconsin department of industry, labor & human relations that Murray's had violated a safety order by not providing guards for the machine and that a penalty can be imposed for not making the employees wear them.

The plaintiff took the stand and testified that before starting to work that morning he had checked the grinding wheel to see if there were any visible flaws in it and whether it was properly balanced. He indicated this was a usual practice for his own safety. Jagmin admitted on cross-examination that he was not wearing a respirator at the time of the accident but denied that he had been instructed to wear one or that he was aware of signs advising their use. The plaintiff also testified he had never asked for a guard for his machine and that he and his fellow workers were not aware of the availability of guards. The defendant's counsel tried to elicit answers which would support an inference that the men did not use guards because it would cut down on their incentive earnings, but the plaintiff responded that the guards in use after the accident did not cut down significantly on the versatility of the portable grinders. On oral argument the respondent's attorney argued that Jagmin was familiar with the use of guards because he had worked as a grinder in the state of Washington for a period of time during the war. However, the record only contains

the fact that he had also done some grinding work in the state of Washington. It does not contain any questions or answers on the type of work done at that time or how long the plaintiff worked in Washington. Nor are there any questions as to the use of guards during that period. Thus there is little or no support in the record for the argument that the plaintiff was negligent with respect to his own safety because he was familiar with guards from a previous work experience and therefore should have asked for a guard when he began to work at Murray's no matter what the practice was at Murray's at the time of his present employment.

The Wisconsin Administrative Code provides that a hood-type or band-type guard strong enough to withstand the shock of a bursting wheel shall be used on every portable wheel where the operation and nature of the work will permit.[26] However, this code is aimed at the duty of employers. Under the Wisconsin safe-place statute employees are proscribed from removing, displacing, damaging or carrying off any safety devices or safeguard furnished and provided for use in any place of employment.[27] It is clear that the plaintiff and his fellow workers did not remove guards from their machines. The guards were not provided except that there was evidence that some were present in the plant in various lockers. Thus the plaintiff apparently did not violate any safety statute. Even when such a statute is violated, it does not establish as a matter of law the degree of contribution of the negligence to the injury.[28]

The trial court refers to the plaintiff not wearing a guard. This must be a reference to a respirator. There

[26] 3 Wis. Adm. Code, IND 1.34 (1) (b).

[27] Sec. 101.11 (2) (b), Stats.

[28] *Grana v. Summerford* (1961), 12 Wis. 2d 517, 107 N. W. 2d 463; *Kenwood Equipment, Inc. v. Aetna Ins. Co.* (1970), 48 Wis. 2d 472, 180 N. W. 2d 750, 182 N. W. 2d 241.

is no evidence that the respirators were intended to protect from flying particles. The Industrial Code prescribes respirators for protection against inhalation of harmful dusts and fumes, not against impact of flying particles. Of course, it can be argued that the respirator could have offered some protection as was conceded by Holfeldter during his questioning by defendant's counsel. But Holfeldter was not a safety expert and it is not clear that the respirator did completely cover the mouth and that it would withstand the impact of a bursting grinding wheel.

The trial court was in error in holding the plaintiff 50 percent negligent as a matter of law. Of course, an employee has a duty to exercise reasonable care for his own safety.[29] The jury did find the plaintiff had been negligent with respect to his own safety. It is not clear, of course, from the special verdict in what respects the jury found him negligent. The jury could have concluded that the plaintiff was not negligent in failing to demand a guard for his machine on the evidence presented, but they may have felt he was negligent in not wearing a respirator. But the jury concluded that whatever the plaintiff's negligence, it was not causal. This conclusion is not wholly unwarranted. If the trial court felt that the apportionment of negligence was grossly disproportionate, it would have been better to grant a new trial than to say that, as a matter of law, the plaintiff must be considered 50 percent negligent.

In a very similar fact situation, the issue of contributory negligence was discussed in *Bravo v. Tiebout & Sons.*[30] This case also involved injury from a bursting abrasive wheel. It was undisputed that at the time of the accident the grinding machine was not provided with a hood as required by the Rules of the Board of Stan-

[29] *Sachse v. Mayer* (1963), 18 Wis. 2d 457, 118 N. W. 2d 914.
[30] (1963), 40 Misc. 2d 558, 243 N. Y. Supp. 2d 335.

dards and Appeals of the State of New York. It was undisputed that the plaintiff would not have been struck by any of the pieces if a hood had been used. The blotter, or label, on the grinding wheel contained the legend: "See A.S.A. Safety Code for operating and speed conditions." The A.S.A. Code was the same as the New York rule. The court said that the manufacturer had every reason to expect its abrasive wheels would be used in accordance with its instructions and the law of the state and could not reasonably foresee the user would operate without protective hoods required for the user's protection. However, the New York State Code apparently had a rule which made workers responsible for using the required safety devices and the court said the plaintiff could not disregard a rule without assuming responsibility for nonadherence to the rules of safety for machinery recognized as dangerous. The court, therefore, concluded that even if the defendant was negligent, he was not liable to the plaintiff. It is not clear whether the court was saying that the employee was equally negligent (and it is not clear whether New York has a system of comparative negligence similar to that in Wisconsin), or whether the defendant had assumed the risk, or whether the plaintiff's negligence was a sole, proximate and intervening cause of the injury.

In the case at bar there are a few vital differences. The Wisconsin Administrative Code does not make the worker responsible for using the prescribed safety devices. The worker is only proscribed from removing safety devices by sec. 101.11 (2) (b), Stats. Thus it does not appear that Jagmin violated any safety statute. Also the record does not really show that either the use of a guard on the machine, or a respirator, or both, would have prevented the injuries in this case.

The Restatement of *Torts* has this to say about warnings:

"Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." [31]

The Wisconsin Civil Jury Instructions on contributory negligence also provide:

". . . If you should find that the user failed to follow the directions and warnings as to the use of the product, then you will find the plaintiff negligent." [32]

But here the warning on the abrasive wheel should not automatically absolve the manufacturer of liability by making anyone who uses the wheels without guards 50 percent negligent as a matter of law. After all, there was no testimony in the record here that the type of guard available for these machines would have prevented all injuries from bursting wheels. Even with a warning on the wheel, can an employee be held 50 percent negligent as a matter of law for not using a guard when none appears to be available at the plant and no special effort is made by the employer to provide them and to make sure that the employees use them? Could it not be reasonable, given the experience of the plaintiff and his fellow workers, for the plaintiff not to have demanded a guard and not to have refused to work without one? This question was for the jury. If the apportionment of no causal negligence to the plaintiff is unsupportable, a new trial should have been granted rather than concluding that the plaintiff in this case was 50 percent negligent as a matter of law.

---

[31] Restatement, 2 *Torts* 2d, p. 353, sec. 402A, comment *j*.
[32] Wis J I—Civil, Part II, 3268.

### Damages.

The plaintiff moved after verdict to have the court determine that the jury award was inadequate as to the amount awarded to the plaintiff for his personal injuries, and raise the amount so awarded from $3,000 to $15,000. The plaintiff particularly claimed that the award was so low as to be contrary to the evidence and that the court erred in allowing the defendant (1) to question the plaintiff as to his military retirement benefits, and (2) to argue to the jury that the permanency of the injury to the plaintiff's lip was subject to correction or repair when there was no evidence to that effect in the record and the defendant did not produce an independent medical witness.

Where an excessive damage award is not due to perversity or prejudice and is not the result of error during the course of the trial, the plaintiff should be given the option of accepting a reasonable amount as determined by the court or a new trial on the issue of damages.[33] The so-called *Powers* rule has been applied to inadequate damage awards as well.[34]

It is clear from the record here that the damage award in this case could not have been the result of perversity or prejudice. There are no incidents revealed by the record which could have aroused the passion or prejudice of the jury. It is also highly unlikely that a jury which has found the plaintiff not contributorily negligent in any way would then, out of perversity, deny the same plaintiff adequate compensation.

Therefore, the question is whether the award is contrary to the evidence or the result of errors committed at the trial. Even where excessive or inadequate awards

[33] *Powers v. Allstate Ins. Co.* (1960), 10 Wis. 2d 78, 102 N. W. 2d 393.

[34] *Parchia v. Parchia* (1964), 24 Wis. 2d 659, 130 N. W. 2d 205.

are the result of prejudicial error, the *Powers* rule may nevertheless be employed where such error relates directly to damages.[35]

The plaintiff produced two medical witnesses. The first witness was Dr. Roy Larsen who treated the plaintiff in the emergency room of the Wausau Memorial Hospital on the day of the accident and saw him periodically for the next two years. The doctor testified that the patient had received a crushing blow to the lower lip with a jagged laceration which had to be sutured both on the inside and the outside. He reported that the patient returned on November 24th and December 4, 1969, and January 8, 1970, and that there was still residual swelling and tenderness. Then on September 16, 1970, he saw the plaintiff and noted scarring and thickening of the right lower lip and a slight eversion or turning out of the lip. On February 24, 1972, he saw the plaintiff again and reported that manual palpitation of the lip revealed increased scar tissue in the substance of the lip proper. The doctor testified that in his medical opinion the injuries were permanent and could cause the problems which the plaintiff reported to him. The plaintiff reported difficulties in enunciation when speaking rapidly, drooling which was especially a problem during sleep, and problems when drinking liquids if he was not careful. These problems were reported to be embarrassing in social situations. The plaintiff also reported he was no longer able to whistle.

The doctor did, however, testify that the patient was not hospitalized nor given extensive medication for pain except immediately after the injury and that he was instructed to return to work on December 29, 1969. The doctor indicated there was no medical reason why he could not return to his grinding job.

---

[35] *Spleas v. Milwaukee & Suburban Transport Corp.* (1963), 21 Wis. 2d 635, 646, 124 N. W. 2d 593.

The plaintiff's dentist, Dr. James Makowski, testified that he saw this patient on November 21, 1969, at which time the plaintiff's mouth was so sore that it was difficult to take X rays. He reported that the plaintiff's upper denture was fractured in ten pieces and that the lower left central tooth was fractured and that the remaining lower teeth were loose and mobile. On December 1st he surgically removed the lower right and left centrals and on December 3d he removed the remaining lower teeth. On December 22d the dentist took impressions for full dentures and these were inserted on January 3 and 12, 1970. Thus the plaintiff was without teeth for approximately two months after the accident.

The doctor did testify that the plaintiff was not hospitalized nor given a prescription for pain killing medication. On cross-examination the dentist reported that the plaintiff had had a full upper plate since approximately 1965, and that he had only eight remaining lower teeth, although these teeth were reported to be healthy and showed only slight decay. Dr. Makowski indicated it was his medical opinion that the loose teeth could not be tightened in the jaw and that it was necessary to remove all the lower teeth.

Thus, in summary, the plaintiff suffered some acute pain when the injury occurred and had to have his lower teeth removed and a full set of dentures fitted. He had swelling of his lip for a long period and now it is permanently thickening with scar tissue and has a slight eversion which requires concentration on the part of the plaintiff to prevent drooling and spilling of liquids in a social situation. The plaintiff is able to work normally. We conclude that an award of $3,000 for pain and suffering in addition to medical expenses is supported by the evidence and is not inadequate.

The plaintiff cited as error the court's overruling of his counsel's objections to questions put to the plaintiff

concerning his retirement and disability payments. The plaintiff can hardly claim that error, if any was committed, was prejudicial when he had an opportunity on redirect examination to correct any adverse inferences or false impressions created by the questions of defendant's counsel and he did not avail himself of that opportunity.

*By the Court.*—Judgment reversed and cause remanded for further proceedings not inconsistent with this opinion.