EUGENE CHRISTOPHERSON, Plaintiff-Appellee, *v.* HYSTER COMPANY, Defendant-Appellant.

First District (5th Division)   No. 77-56

Opinion filed March 17, 1978.—Rehearing denied April 17, 1978.

Kirkland & Ellis, of Chicago (Francis B. Libbe, Gary M. Elden, and Jay R. Franke, of counsel), for appellant.

Phelan and Pope, of Chicago (Richard J. Phelan, Michael A. Pope, and William T. Cahill, of counsel), for appellee.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Plaintiff, Eugene Christopherson, brought this strict liability action in the circuit court of Cook County, Illinois, against defendant, Hyster Company (Hyster), to recover damages for severe injuries he sustained while operating a Hyster Model S40-B forklift truck. The case was tried under the substantive law of Wisconsin, where the injury occurred, and a judgment was entered on a special jury verdict for plaintiff in the sum of $1,575,000 from which Hyster appeals. We affirm. A summary of the background of the instant litigation is helpful.

Plaintiff worked as a forklift operator for Chilton Metal Products, Inc. (Chilton), located in Chilton, Wisconsin. On February 25, 1970, he was injured at the Chilton plant when the top two of four vertically stacked wire containers which he was transporting fell from the forks of the lift truck and struck him on the neck, resulting in permanent paralysis of his limbs. The forklift involved in the accident was defendant's model S40-B, manufactured and sold by defendant in 1965 without an overhead safety guard. Chilton purchased this forklift from the Milwaukee Engine & Equipment Corp. (Milwaukee Engine), an independent Hyster dealer who had in turn purchased it from Hyster.

The law of Wisconsin, which controls this case, provides that Wisconsin's comparative negligence law applies in strict products liability actions. Therefore, a manufacturer's liability for producing an unreasonably dangerous and defective product is termed "negligence per se," and is in turn compared with the negligence of plaintiff and others in order to determine if a recovery may be had in a particular case. See *Dippel v. Sciano* (1967), 37 Wis. 2d 443, 155 N.W.2d 55; *Greiten v. LaDow* (1975), 70 Wis. 2d 589, 599, 235 N.W.2d 677, 683;[1] *Howes v. Deere & Co.* (1976), 71 Wis. 2d 268, 238 N.W.2d 76; *Connar v. West Shore Equipment of Milwaukee, Inc.* (1975), 68 Wis. 2d 42, 227 N.W.2d 660; *Schuh v. Fox River Tractor Co.* (1974), 63 Wis. 2d 728, 218 N.W.2d 279.

On October 28, 1974, at the first trial of this case, a jury returned a

[1] Although the opinion of Justice Heffernan is identified as the concurring opinion, in fact, it is the majority opinion of the court. *Howes v. Deere & Co.* (1976), 71 Wis. 2d 268, 274, 238 N.W.2d 76, 80.

special verdict finding plaintiff and Hyster each 50% negligent, and separately assessing plaintiff's damages at $640,000. Under Wisconsin law, in effect at the time of this occurrence, a plaintiff whose negligence equaled that of defendant recovered nothing (*Lupie v. Hartzheim* (1972), 54 Wis. 2d 415, 195 N.W.2d 461), and the trial court accordingly entered judgment for defendant. The trial court, however, granted plaintiff's motion for a new trial, and Hyster's petition for leave to appeal the new trial order pursuant to Supreme Court Rule 306 (Ill. Rev. Stat. 1975, ch. 110A, par. 306) was denied. The testimony adduced at the second trial in this case, pertinent to the issues in the instant appeal, follows.

Arthur Huebner, vice-president of product engineering for Hyster, was called by plaintiff as an adverse witness. He had worked for Hyster in various engineering capacities dealing with the design of industrial trucks continuously since 1948, and particularly from 1961-69 served as the engineering manager for Hyster's industrial truck division.

The lift truck involved in this case was Hyster's model S40-B, which was produced from 1959 until about 1966. Huebner stated that the immediate predecessor to the S40-B was the YC-4000, and a third model was the S40-C. All three models were designed to lift, transport and stack loads of up to 4000 pounds. Indeed, Huebner stated that the primary purpose of the S40-B was to stack materials. It was designed to be used in warehouses, close quarters, boxcars, and other low-clearance areas. The upright on this particular model was 69.5 inches tall, with a vertical lift up to 103 inches. When the top of the upright is 69.5 inches from the ground it would be approximately even with the shoulders of the average driver. Thus, in order to enter some low-clearance areas with the S40-B a driver must lower his head to the side.

Huebner stated that when a lift truck possesses no overhead guard, there is always some danger that stacked materials may fall on the operator. However, the degree of danger depends on the condition of the stacked materials. If the stacks are stable they are not likely to fall.

The primary reason why Hyster did not include an overhead guard on such trucks in 1975 was due to the low-clearance problem. The S40-B with a standard overhead guard could not enter the vans of transport trucks in order to remove pallets of materials. However, back in 1964 and 1965 there were some retractable overhead guards for these trucks. In fact, in 1965 the technology was available to build retractable or low profile guards. Hyster attempted to develop a workable retractable guard at that time, but the disadvantages of such designs presented greater problems than having no guard at all. However, in 1966, an overhead guard was made standard on the S40-B unless the customer specifically requested its exclusion. This policy was motivated by the incidence of accidents which

had occurred. In 1970, Hyster extended this policy by refusing to omit an overhead guard unless the customer stated in writing that the truck was to be used only in low-clearance areas.

Huebner also stated that in designing a truck with a 103-inch lifting capacity, one would expect the customer to eventually use the full lift capacity of the truck. Thus, Huebner would expect this machine to be used to stack stable loads of 4000 pounds or less to a height of 103 inches. However, in Huebner's opinion the load lifted by plaintiff in the instant case was not a stable one. The four baskets totaled a height of 12 feet with the center of gravity 6 feet high, above the upright. Thus, the column was too high, with only a small base of support, to allow it to be a stable load while being moved.

Returning to the subject of retractable guards, Huebner explained his earlier statement that in 1965 the designs for such guards raised great disadvantages. Generally, they interfered with the truck's maneuverability in close quarters by adding on folding members which extended the length of the truck; or if a telescoping design was used it involved adding materials to the body of the truck which would raise its center of gravity and make the entire truck less stable. In addition, the added parts necessary for retractable guards would tend to obscure the operator's field of vision. To his knowledge, in 1965 there was no standard retractable guard made by any manufacturer in the industry.

Huebner recognized that in 1964 Allis-Chalmers applied for a patent on the design of a retractable guard for these trucks. The patent was apparently issued in 1966; however, to his knowledge the design was never produced by anyone. Hyster finally developed and marketed a retractable overhead guard for these trucks in 1970.

The testimony of Donald Shaffner, as given at the first trial in this case, was then read into the record. Shaffner is the sales manager for the industrial truck division of Hyster. He had been employed by Hyster in advertising and sales continuously since 1948. In 1965 he was the field sales manager in Oakbrook, Illinois.

Shaffner stated that he and the other Hyster people knew that these machines were being used in factories to move and stack materials. Under certain conditions, when a load was lifted above an operator's head, with no overhead guard present, these trucks would be dangerous. The danger, however, depends on the load being carried; if the load was a large solid box, extending in part above the vertical uprights, it would not be dangerous, but if it were a multitude of parts that could become separated it could become dangerous. With respect to the instant case, a load of four wiretainer baskets would be obviously dangerous because it could come apart with any sudden movement. Shaffner had never seen an S40-B truck take one load of four such containers in one stack.

Larry Faust was called as a witness by plaintiff and testified that he had been employed by Chilton from February of 1968 to July of 1976. From 1968 through February 25, 1970, he worked as a forklift operator along with plaintiff.

When obtaining materials from the stock room, Faust stated that the lift operators did not have to move the wiretainer baskets four at a time. They did so, however, to keep things going faster. When a four-basket-high load was moved, it was only a matter of a few feet; just far enough to allow access to the parts the operator wanted to bring to the press room.

Faust identified plaintiff's exhibits portraying the interlocking mechanism used by Chilton in stacking the wiretainer baskets together. Pegs on the bottom of one basket would fit into container slots in the top of a second basket, and so on. When joined together these form a stable apparatus, so that if someone physically grabbed it they could not just shake it loose.

Faust also stated that in the press room only two baskets at a time could be stacked and carried, possibly because of the danger that more than two would fall over. Such a danger would be present whether the four-basket-high stack was being moved in the press room or the stock room. However, until the instant accident Faust was not really aware of the danger that the top baskets themselves could fall from a four-basket load. His concern was more for parts falling out of the baskets in such a load and injuring someone.

While working as a lift operator prior to the accident, Faust complained about the lack of an overhead guard. However, his complaint was prompted by a fear that parts might fall on him; it never occurred to him that the basket itself could fall. The baskets were not tied together, but were held together by stakes in one basket which fit into holes in the basket underneath.

Faust also stated that when a four-basket load is moved and the top baskets touch other stationary baskets, it is possible that the top two baskets will fall back on the operator. However, an S40-B cannot lift just the top basket of a stack of four. At a minimum an operator must remove the top two baskets. When he does so, the top basket is still 12 feet high, and above the uprights. In order to remove just the top two baskets the operator would first place the fork between the second and third baskets, "jiggle" them some because of the weight of the baskets, and then lift the top two off.

Plaintiff testified in his own behalf that he first began driving a forklift truck for Chilton on May 1, 1969. On three occasions prior to the instant occurrence, materials had fallen out of the scrap bucket or wire baskets of his forklift. On one of these occasions plaintiff was injured.

On the night of the accident plaintiff went to get some "900" housings

from the stock room. There were two stacks of four baskets in front of the housings. He moved these stacks, removed the housings, and began returning the first two stacks to their proper places when the accident happened.

Plaintiff, prior to the accident, had never heard of any baskets falling back. Plaintiff did not believe the baskets could fall on him. As he was moving the second stack of baskets back into place, plaintiff was watching on each side to make sure he did not hit anything. There was 3 to 6 inches clearance on each side of the stack, when all of a sudden plaintiff looked up and the baskets were already falling over on him.

At the time of the accident the forks were about one-half inch off the ground and tilted back 1 or 2 degrees. Plaintiff was only concerned that parts inside the baskets, not the baskets themselves, would fall over. From his previous experiences of having materials or parts fall on him, plaintiff was aware that a condition of danger existed when anything was above the upright and there was no overhead guard on the truck. Plaintiff did recall testifying earlier that the company rule permitted carrying only two baskets at a time in the press room and that with four baskets there is a greater danger they might fall and hurt someone.

Edward Landry, a consulting safety engineer, testified as an expert witness for plaintiff. He had worked for many years with various employers, with emphasis on industrial safety. Landry stated that in his opinion when the S40-B is used without an overhead guard to lift and stack materials above the operator's head, it is in a dangerous and defective condition because it exposes the operator to materials falling from either the stack being worked on, or other stacks in the area. Whenever you have materials elevated above an operator's head, there is a danger that something will fall on top of the operator. The higher the load, the higher the center of gravity, thus making the instability of the load greater.

Landry recognized that one of the purposes of the S40-B was for use in low-clearance areas, and that equipping this machine with an overhead guard would interfere with that particular function. However, in his opinion, eliminating the guard for use of such machines in low-clearance areas where the operator had to duck his head also comprised a dangerous and defective condition.

Frank B. Diehn was the first witness called by defendant. He is vice president of Milwaukee Engine and had worked there since 1959. Milwaukee is an independent dealer franchised to provide Hyster equipment to customers in Wisconsin. In 1965, Diehn sold Chilton the lift truck involved in the instant occurrence. The people at Chilton told him the truck would be used on a shipping and receiving dock, and in the propane plant. Neither of these locations has a high stacking area. Chilton

rejected Diehn's suggestion that an overhead guard be purchased for this machine.

Diehn stated that he had seen the high-stacking area of the Chilton plant. He had seen forklift trucks operate in this area, and without an overhead guard the operator of a truck is dangerously exposed if a stack falls.

The truck involved in this case was going to be used in over-the-road trailers. It definitely should not be used in stacking. Diehn admitted stating in his deposition that this truck could, however, be used any place in the plant.

The upright on this truck was the lowest upright made at that time. There is nothing to prevent an operator from lifting a load above the uprights on a truck without an overhead guard, other than the operator's own knowledge of safety and common sense.

In Diehn's opinion the load involved in the instant occurrence was very unstable. This would be true regardless of what lift truck was used because of the 12-foot-high stack with a 3-feet-square base. The center of gravity is way over the top of the lift truck. The fact that the wiretainers had a type of interlocking legs in the corners stiffens the load to a certain degree. However, in placing such a 36 x 36 x 42 inch load in a basket with four legs rather than on a flat base, the instability factors of that basket increase rather than decrease.

Herbert Ripple, vice president and general manager of Chilton, testified that he had ordered the truck involved in this occurrence from Mr. Diehn at Milwaukee Engine back in 1965. Overhead guards were available through Milwaukee Engine, but none was ordered because this truck was to be used in loading semitrailer trucks.

The second jury returned a special verdict finding Chilton (not a party to the suit) 50% negligent, plaintiff 10% negligent, and Hyster 40% negligent. An intervening Wisconsin decision had determined that the jury should apportion negligence not only between plaintiff and defendant, but also among responsible third persons not parties to the proceeding. (*Connar v. West Shore Equipment of Milwaukee, Inc.* (1975), 68 Wis. 2d 42, 227 N.W.2d 660; see also *Heldt v. Nicholson Manufacturing Co.* (1976), 72 Wis. 2d 110, 240 N.W.2d 154.) The jury assessed plaintiff's damages at $1,750,000. Subtracting an amount proportional to plaintiff's 10% negligence (Wis. Stat. Ann. §895.045 (West Supp. 1977-78)), judgment was entered against Hyster for $1,575,000. Hyster appeals from this judgment and from the denial of its post-trial motions for a judgment *n.o.v.* or, in the alternative, a new trial.

OPINION

Hyster initially contends that it was entitled to a judgment *n.o.v.* in that

this S40-B forklift truck was neither defective nor unreasonably dangerous under Wisconsin strict products liability law. We must disagree.

■■ Preliminarily we turn to Hyster's contention that the trial court improperly applied the Wisconsin standard of proof for judgments *n.o.v.* While we agree that the Illinois standard as expressed in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, should apply to this issue (see *Mithen v. Jeffery* (1913), 259 Ill. 372, 102 N.E. 778; Restatement (Second) of Conflict of Laws §135 (1971)), we need not expound at length over this question in the instant case. Even assuming *arguendo* that the trial court considered the evidence in light of the Wisconsin rule, such error could in no way be prejudicial. In *Pedrick* our supreme court declared that judgments *n.o.v.* should only be entered "in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.) In our view, the evidence in the instant case satisfactorily mandates that Hyster's motion for a judgment *n.o.v.* was properly denied even under the *Pedrick* standard.

Under the Wisconsin law of strict liability plaintiff must prove, *inter alia*, that the forklift truck in this case contained a defective condition, which condition was unreasonably dangerous. These are two distinct elements of proof which must both be present for any recovery to occur in a strict products liability action. (See *Chart v. General Motors Corp.* (1977), 80 Wis. 2d 91, 258 N.W.2d 680; *Vincer v. Esther Williams All-Aluminum Swimming Pool Co.* (1975), 69 Wis. 2d 326, 230 N.W.2d 794; *Howes v. Hansen* (1972), 56 Wis. 2d 247, 201 N.W.2d 825.) Hyster contends that the evidence in the case at bar was insufficient to prove either of these two essential elements, and thus the trial court erred in not granting Hyster's motion for judgment *n.o.v.*

In dealing with these elements, the Wisconsin Supreme Court has adopted the language contained in the comments to section 402A of the Restatement (Second) of Torts. (See *Vincer v. Esther Williams All-Aluminum Swimming Pool Co.; Arbet v. Gussarson* (1975), 66 Wis. 2d 551, 225 N.W.2d 431.) Comment *g* to section 402A defines a "defective condition" in pertinent part as follows:

"The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." (Restatement (Second) of Torts §402A, comment *g* (1965).)

In the instant case there is no question that the forklift left Hyster's hands

and reached plaintiff minus an overhead guard, and that one of the purposes of this truck was to stack materials. The truck was manufactured with a 103-inch vertical lift capacity, while the uprights were only 69.5 inches tall. The jury could conclude from this evidence alone that the lack of an overhead guard on that kind of machine constituted a defective condition. Such a conclusion is further supported by the testimony of Landry, plaintiff's expert, that this machine was in a defective condition, as well as the testimony of Huebner, Shaffner and Diehn to the effect that the operator of that kind of a truck is dangerously exposed to falling materials. Indeed, Hyster has conceded to this court that a hazard exists in using this truck, without an overhead guard, to highstack materials.

Hyster argues, nevertheless, that this truck was as safe as possible when manufactured in 1965 in that (1) no feasible low-profile or retractable overhead guards had been developed, and (2) affixing the standard overhead guard would have been inconsistent with the low-clearance use of the S40-B. Such arguments are not persuasive. First, the evidence concerning the feasibility of retractable guards was conflicting. Secondly, neither of these factors would prevent a jury concluding that this truck, without some type of overhead guard, was defective when used in such a condition to stack materials, or when used in high-stack areas, low-clearance problems notwithstanding. Strict liability goes to the condition of the product and not the conduct of the manufacturer. While a manufacturer is not an insurer of its product's total safety, in order to recover, "[i]t is enough to prove, irrespective of due care, that, because of its dangerously defective nature, the product caused harm." (*Greiten v. LaDow* (1975), 70 Wis. 2d 589, 603, 235 N.W.2d 677, 685.) Thus, the key question before this court is whether the defect in this case was an unreasonably dangerous one.

Comment *i* to section 402A defines "unreasonably dangerous" in part as follows:

> "The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. * * * The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." (Restatement (Second) of Torts §402A, comment *i* (1965).)

Based on the language of comment *i*, the Wisconsin Supreme Court has stated:

> "Thus, the test in Wisconsin of whether a product contains an unreasonably dangerous defect depends upon the reasonable

expectations of the ordinary consumer concerning the characteristics of this type of product. If the average consumer would reasonably anticipate the dangerous condition of the product and fully appreciate the attendant risk of injury, it would not be unreasonably dangerous and defective. This is an objective test and is not dependent upon the knowledge of the particular injured consumer, although his knowledge may be evidence of contributory negligence under the circumstances." (*Vincer v. Esther Williams All-Aluminum Swimming Pool Co.* (1975), 69 Wis. 2d 326, 332, 230 N.W.2d 794, 798-99; see also *Greiten v. LaDow* (1975), 70 Wis. 2d 589, 596, 235 N.W.2d 677, 682 (Hansen, J., concurring); *Arbet v. Gussarson* (1975), 66 Wis. 2d 551, 225 N.W.2d 431.)

Hyster contends that, under this test, the danger involved in lifting a 12-foot-high stack with no overhead guard is so open and obvious that no contrary verdict may stand. Therefore, Hyster argues, the *unreasonably dangerous* element is missing from plaintiff's case, and as a matter of law Hyster was entitled to a judgment *n.o.v.* Once again, we must disagree.

In reviewing the record before us in its light most favorable to plaintiff, we conclude that the evidence was sufficient to sustain the jury's verdict for plaintiff in this regard. While there was testimony to the effect that raising a load such as the one in this case was obviously dangerous, the evidence also showed that the wire baskets involved in the accident were ruggedly constructed and fitted together with a "peg-and-hole" system. This arrangement would certainly stabilize and strengthen the load to some degree. Furthermore, the four-basket-high stack was only lifted off the ground a few inches, and tilted a minimal one or two degrees back, and then it was only moved a matter of a few feet. This was not a situation wherein the entire load was being lifted to the 103-inch level. Nor was it a situation where such a load was being moved a considerable distance from the stock room into the press room. In the history of moving full stacks minimal distances in this manner at Chilton, no such accident had ever occurred. The baskets themselves had never fallen before. Under such circumstances, one might well conclude that the reasonable man, or ordinary customer, might not fully realize the danger involved.

Indeed, plaintiff and his co-worker, Faust, testified that they realized that parts could fall from the baskets, but did not realize that the baskets too could fall. Thus, while they realized some danger they did not "fully appreciate the attendant risk of injury." We cannot say as a matter of law that such realizations do not represent those of the ordinary consumer. Certainly, the determination of whether a defect or hazard is so obvious as to be not unreasonably dangerous "is not *dependent upon* the

knowledge of the particular injured consumer." However, such knowledge may be a factor in the determination of this issue. While plaintiff and Faust both realized that the press room rule proscribing the moving of more than two baskets per load was engendered by the possibility that greater loads might fall on someone, this is just one further factor for the jury's consideration. As noted previously, moving the baskets long distances to and through the press room differs substantially from moving a load a few feet in the warehouse. Considering all the evidence, therefore, we conclude that Hyster was not entitled to a judgment *n.o.v.* under the *Pedrick* rule.

Hyster also contends that it was entitled to a judgment *n.o.v.* in that plaintiff's contributory negligence exceeded any possible negligence on Hyster's part as a matter of law. As noted, the jury apportioned 40% of the causal responsibility for the accident to Hyster, 50% to Chilton, and 10% to plaintiff.

The comparison of the negligence of the parties under Wisconsin law is peculiarly within the province of the jury (*Millsap v. Central Wisconsin Motor Transport Co.* (1963), 41 Ill. App. 2d 1, 189 N.E.2d 793), and it is only in an unusual case that the jury's apportionment should be upset by the court. (*Jagmin v. Simonds Abrasive Co.* (1973), 61 Wis. 2d 60, 211 N.W.2d 810.) In the instant case plaintiff testified that he had been struck on three previous occasions by parts falling out of loads he was carrying with that truck. However, plaintiff and his co-worker both testified that they were not really aware of the fact that the baskets themselves could escape the interlocking device and fall on the lift operator. The 12-foot-high stacks in the stock room had always been moved in a similar manner, and no baskets had ever fallen before. While plaintiff was aware of the reason behind the proscription against a load greater than two baskets being carried in the press room, we have already noted that conditions in the stock room were different, *i.e.*, the 12-foot-high load was only moved short distances therein. Plaintiff had requested an overhead guard in the past as protection against falling parts, yet none had been provided. Under such circumstances, we cannot conclude as a matter of law that the jury's apportionment of only 10% causal negligence to plaintiff was error. As the Wisconsin Supreme Court has noted:

> "[C]an an employee be held 50 percent negligent as a matter of law for not using a guard when none appears to be available at the plant and no special effort is made by the employer to provide them and to make sure that the employees use them? Could it not be reasonable, given the experience of the plaintiff and his fellow workers, for the plaintiff not to have demanded a guard and not to have refused to work without one? This question was for the jury."

(*Jagmin v. Simonds Abrasive Co.* (1973), 61 Wis. 2d 60, 89, 211 N.W.2d 810, 825; see also *Fonder v. AAA Mobile Homes, Inc.* (1977), 80 Wis. 2d 3, 257 N.W.2d 841.)

So too in the instant case it was for the jury to decide how much plaintiff was at fault in moving a 12-foot-high stack in the stock room, in the same manner that such stacks had always been moved previously.

Nor can we conclude that as a matter of law the jury's apportionment of negligence to Hyster should be reduced. The jury had the option before it of assessing blame to both Chilton and Hyster. In view of the fact that Hyster manufactured and delivered the truck without an overhead guard, and knew that at least a portion of the uses of such a truck would be in high stack areas, we cannot say that the apportionment of 40% causal negligence to Hyster was improper as a matter of law. Admittedly, the low-clearance use of the S40-B made the standard overhead guards impractical. However, Hyster knew of the danger posed by such trucks without a guard, and made a conscious choice to incur that risk rather than effect the use of the S40-B. Even assuming the low-profile and retractable guard technology was inadequate in 1965, Hyster could have made the fixed overhead guards standard equipment, as it later proceeded to do. The onus would then have been on the employer to remove such guards. In sum, then, the jury was in the best position to decide whether the defective forklift assumed a more dominant role in causing plaintiff's injuries than plaintiff's conduct, and in apportioning the relative percentages of causal negligence thereto. We believe its verdict in this regard should not be disturbed, and therefore the trial court properly denied Hyster's motion for a judgment *n.o.v.* on the grounds of plaintiff's contributory negligence.

Hyster also claims that it was denied a fair trial, and points to five examples of trial court error as indicative that a new trial should be granted in the instant case. We disagree.

First, Hyster contends that the trial court erred in admitting evidence of post-sale product changes. Specifically, Hyster challenges the trial court's allowance of plaintiff's evidence concerning the post-sale technological developments of a retractable overhead guard, and post-sale changes in the marketing policies of Hyster related to making overhead guards standard equipment on its forklift trucks.

■■■ In conflict cases, the law of the forum generally controls questions of evidence. (*People v. Saiken* (1971), 49 Ill. 2d 504, 275 N.E.2d 381, *cert. denied* (1972), 405 U.S. 1066, 31 L. Ed. 2d 796, 92 S. Ct. 1499; Restatement (Second) of Conflict of Laws §138 (1971).) The Illinois courts have concluded that evidence of post-sale product modifications is relevant and material to the question of feasible design alternatives available to the

manufacturer and should be admitted for that purpose. (*Cunningham v. Yazoo Manufacturing Co.* (1976), 39 Ill. App. 3d 498, 350 N.E.2d 514; *Sutkowski v. Universal Marion Corp.* (1972), 5 Ill. App. 3d 313, 281 N.E.2d 749.)[2] In our view, the complained-of evidence was properly admitted in the instant case under this rule.

Arthur Huebner testified that to his knowledge no *standard* retractable overhead guard was available from any forklift manufacturer in 1965. However, he also testified that the technology was available in 1965 to construct such guards, and further that retractable guards for these low-clearance trucks were available from some manufacturers of forklifts in 1964 and 1965. Huebner stated that Hyster ran into certain design problems in attempting to manufacture retractable guards in 1965, but stated that by 1970 Hyster was in fact marketing such guards.

We believe such evidence to have been relevant to the issue of the feasibility of retractable overhead guards at the time the instant lift truck was manufactured. The statements by Huebner were conflicting. Certainly it was not established that such guards were not possible in 1965. Indeed, Huebner indicated that other manufacturers could produce such guards for customers who desired them at that time. These statements are an indication that such guards were feasible in 1965 and the jury could properly consider this evidence.

Hyster was in no way precluded from combatting this evidence. Indeed, it elicited testimony from Huebner that the 1965 retractable guards posed certain design problems which Hyster adjudged to be worse than having no guard at all. This was another factor for the jury's consideration on this issue. In addition, in light of Huebner's statements that the technology for such guards existed in 1965 and that they were being manufactured by other companies at that time, it could have questioned Huebner as to what technological breakthrough at Hyster allowed it to produce such guards in 1970, but not in 1965. This it declined to do.

Lastly, we note that a conclusion that retractable guards were feasible in 1965 is not necessary to the jury's verdict in this case. Clearly, some overhead guards were available, even if only the fixed, nonretractable kind. Hyster apparently chose in 1965 not to make such guards standard due to low-clearance problems, while at the same time realizing this machine could and would be used in high-stack areas. This was a conscious marketing choice, and if the jury found that the lack of a guard on such a machine, despite the low-clearance problems, was an unreasonably dangerous condition which led to plaintiff's injuries, liability

---

[2] We note that the Wisconsin Supreme Court has recently reached a similar conclusion. *Chart v. General Motors Corp.* (1977), 80 Wis. 2d 91, 258 N.W.2d 680.

accrues. The existence of a retractable guard, while something which the jury could consider, is not vital to such a finding.

As regards the evidence that Hyster, after 1965, made overhead guards standard equipment on these forklift trucks, this too was admissible. Hyster concedes that it could have instituted such policies in 1965, but contends that such a design alternative was so obvious and undisputed that any evidence in this regard was not material. We cannot agree with this logic.

Where evidence is offered which is probative of a matter in issue, that evidence is material. (*Migliore v. County of Winnebago* (1974), 24 Ill. App. 3d 799, 321 N.E.2d 476.) In the instant case, Hyster contended that in 1965 it did not, or could not, make an overhead guard standard equipment due to low-clearance problems encountered in loading and unloading the vans of semi-trailer trucks. Yet in 1966 Hyster did in fact make such guards standard on S40-B forklifts, and strengthened this policy in 1970, while still facing those same low-clearance problems which had existed in 1965. Certainly such evidence is probative as to the issue of exactly how much the low-clearance uses of the S40-B affected, or were responsible for, the lack of standard overhead guards in 1965.

Hyster next contends that the court erred in refusing to allow into evidence Hyster's exhibits intended to represent a scale model of the wiretainer load lifted by plaintiff at the time of the accident. Plaintiff had introduced a ¼-scale model of the S40-B forklift, which was frequently referred to during the trial. Hyster offered into evidence four ¼-scale cardboard shapes representing the wiretainers relative to the model forklift. These were refused by the court on the grounds that (1) they did not show the peg-and-hole connections between the wiretainers and were constructed so as to prejudicially imply instability of the load, and (2) the height of the load had been adequately shown by other evidence. Subsequently Hyster offered an exhibit consisting of a number of pieces of cardboard taped together to form a single ¼-scale cardboard shape representing the entire four-wiretainer load, which was also refused by the court.

■■ The admission of evidence rests largely within the discretion of the trial court and its decision will be reversed only when such discretion has been clearly abused. (*Cratsley v. Commonwealth Edison Co.* (1976), 38 Ill. App. 3d 55, 347 N.E.2d 496; *Cole v. Brundage* (1976), 36 Ill. App. 3d 782, 344 N.E.2d 583.) We find no such abuse in the instant case. Both of the proffered exhibits were constructed of thin cardboard taped together, and are substantially less than representative of the interlocked baskets which comprised the actual load in this case. While only intended to illustrate the height of the load in relation to the truck, such exhibits could potentially mislead the jury and unfairly prejudice plaintiff's case.

Furthermore, the trial court concluded that the proffered evidence

concerning the height of the 12-foot-load involved in this case would merely be cumulative. In rejecting the initial exhibit of four separate boxes the court stated:

"There has been ample evidence and cross examination on all evidence relating to the height of this stack. You [defense counsel] have evidenced that by getting on top of the ledge of the witness stand taking your shoes off and extending the measuring ruler all the way up to the ceiling, and you had a witness designate and illustrate to the jury the height that this stack reached. We have photographs in evidence of the height of this over and above the upright."

Again, in rejecting Hyster's second cardboard exhibit the court essentially reiterated the above statement and concluded that there had "been ample testimony in the record with respect to the jury's ability to observe and view the height of the load in question." We must agree with the trial court that substantial evidence was introduced concerning the relationship between the height of the load and the height of the uprights. The introduction or exclusion of cumulative evidence is wholly within the discretion of the trial court. (*Ross v. Pfeifer* (1976), 39 Ill. App. 3d 789, 350 N.E.2d 797; *Gaenzele v. B. E. Wallace Products Corp.* (1976), 39 Ill. App. 3d 93, 350 N.E.2d 571.) We find no error in the court's exercise of such discretion in the instant case.

The final three examples of trial court error alleged by Hyster concern the instructions given to the jury in this case. Hyster argues that the court: (1) improperly instructed the jury on plaintiff's duty of care under Wisconsin law; (2) improperly instructed the jury on Hyster's duty of care under Wisconsin law; and (3) improperly instructed the jury on inapplicable Illinois substantive law.

■■ In determining whether the jury has been properly instructed, the instructions must be considered as a whole. (*Gaenzele v. B. E. Wallace Products Corp.*) No error is committed in refusing even instructions correctly stating the law where the instructions given do adequately instruct the jury. (*Gaenzele v. B. E. Wallace Products Corp.*) With these principles in mind we turn to Hyster's allegations of error.

The first alleged error in instructions was the trial court's failure to give defendant's instruction no. 19. This instruction was taken verbatim from the Wisconsin Jury Instructions—Civil—Part II, 3254[3] and stated:

"The buyer (consumer) has a duty to use ordinary care for his own safety and protection, and, to that end, to observe all obvious and patent defects and dangerous conditions, if any, which are open and obvious to him if he is using reasonable care and caution

---

[3] The Wisconsin Jury Instructions are not mandatory and its authors recognize that it is not intended "as a standard of instructions pattern to be blindly and unquestionably followed." (See Wisconsin Jury Instructions—Civil—Part I, Introduction.)

for his own safety and protection. The danger, however, must not only be obvious, but must be understood by the buyer (consumer). The failure to use a product in accordance with the instructions which are adequate, if you find they were adequate, or the use of such product in an abnormal manner is negligence.

You are further instructed that a person is not bound absolutely by law to see every defect or dangerous condition, or even to remember the existence of every defect or dangerous condition of which he had knowledge. He is only required to act as a reasonably prudent person under the same or similar circumstances would act.

You are further instructed that a person is not required to anticipate negligent acts or omissions on the part of others, and is not guilty of contributory negligence in failing to look out for danger when there is no reason to suspect any such danger."

Hyster concedes that the last two paragraphs of this instruction were contained in plaintiff's instruction no. 26, but argues that the omission of the first paragraph was prejudicial error in that the given instruction "in effect only stated what plaintiff's duty was *not.*" We disagree.

In rejecting defendant's instruction no. 19 the court noted that it was repetitive of plaintiff's instructions nos. 25 and 26. We have previously noted that plaintiff's instruction no. 26 did in fact contain the last two paragraphs of defendant's instruction no. 19. In addition, plaintiff's instruction no. 26 contained the following statement:

"You are instructed that the plaintiff owed a duty to use ordinary care for his own safety, and, to that end, to observe the conditions surrounding him while at work upon the premises in question and the dangers which were open and obvious to him if he were using reasonable care and caution for his own safety, and, thereupon, to use the care of an ordinary intelligent and prudent workman to carry on his work so as to guard against injury to himself, so far as by reasonable care he could protect himself."

We agree with the trial court that this language adequately instructed the jury as to plaintiff's duty of care to observe and avoid open and obvious hazards.

Furthermore, we note that the wording of defendant's jury instruction no. 19 also addresses the issue of the duty to comply with product instructions [of the manufacturer]. There was no evidence or issue in this case concerning product instructions and this portion of jury instruction no. 19 could only have confused the jury as to the actual issues in the case.

Hyster, however, also objects that the inclusion of a "workman's duty of care" in plaintiff's instruction no. 25 was improper. In addition to the previously excerpted paragraph, the complained-of instruction reads, in relevant part, as follows:

"The fact that a workman having knowledge of the existence of a danger continues to perform his work does not, of itself alone, make him lacking in ordinary care for his own safety. He fails to use such care only when, with full knowledge of the existing danger and with free choice of acting either so as to avoid the danger or so as to expose himself to it, he deliberately or carelessly acts in the latter manner.

You are further instructed that momentary diversion of attention or preoccupation of a workman in the discharge of his duties minimizes the duty of care required by him in the absence of such diversion or preoccupation."

Hyster argues that such a "workman's duty of care" instruction is improper in a Wisconsin products liability action since in Wisconsin there is a duty on plaintiff to avoid "objectively obvious hazards regardless of plaintiff's subjective disabilities." Our response to this contention is two-fold.

■■ First, our review of the record reveals that Hyster failed to make this particular objection to the trial court. Hyster's objections to plaintiff's instruction no. 25 were based on the grounds that the court was not giving Wisconsin Jury Instruction 3254 (defendant's instruction no. 19) in its entirety. Hyster never objected that the workman's standard of care instruction was inapplicable to products liability cases. Objections to instructions not called to the trial court's attention may not be urged on review. *People v. Abrams* (1971), 48 Ill. 2d 446, 271 N.E.2d 37; *People v. Hill* (1975), 34 Ill. App. 3d 193, 339 N.E.2d 405.

Secondly, plaintiff's instruction no. 25 was taken from Wisconsin Jury Instructions—Civil—Part I, 1051. This instruction appears in a section dealing with negligence and the duties of persons in specific situations, one of which is a workman on the job. Since the jury in the instant case, for purposes of applying the Wisconsin law of comparative negligence, had to determine the amount, if any, of plaintiff's negligence, we believe this instruction was properly given. Indeed the last paragraph of the complained-of instruction states that it is aimed at the jury's determination of plaintiff's negligence.

"You will carefully consider all the credible evidence bearing on this inquiry and make such answer as you feel should be made, to the end that it may be determined by you whether the plaintiff, Eugene Christopherson, was or was not negligent."

The instruction does not mandate that the jury absolve plaintiff of all blame because he was a workman. To the extent plaintiff voluntarily lifted a four-basket-high load the jury could, and apparently did, find him negligent. But we believe they also were entitled to consider that plaintiff had no say in determining whether his truck had an overhead guard.

Furthermore, to the extent plaintiff was preoccupied with checking the clearance on each side of the stack he was moving, the jury could consider he was not negligent in failing to notice at an earlier point that the top baskets were tipping over on him. Therefore, we believe the instant instruction properly sets out factors relevant to the issue of plaintiff's negligence. *Cf. Heldt v. Nicholson Manufacturing Co.* (1976), 72 Wis. 2d 110, 240 N.W.2d 154; *Jagmin v. Simonds Abrasive Co.* (1973), 61 Wis. 2d 60, 211 N.W.2d 810.

The second alleged error in instructions was the trial court's refusal to define the terms "defective condition" or "unreasonably dangerous." Defendant's instructions nos. 11 and 23, taken from Wisconsin Jury Instructions—Civil—Part II, 3260, were both refused. Each contained the following pertinent definitions:

> "A product is said to be defective when it is not reasonably fit for the ordinary purposes for which such product was sold and intended to be used, and the defect arose out of design, manufacture, or inspection while the article was in the control of the manufacturer. A defective product is unreasonably dangerous to the user or consumer when it is dangerous to an extent beyond which would be contemplated by the ordinary user (consumer) possessing the knowledge of the product's characteristics which were common to the community."

This instruction was properly refused in that: (1) a further paragraph refers to the manufacturer's duty to warn, which was not an issue in this case, and (2) it could well have confused the jury by indicating that a manufacturer's liability is limited to those injuries resulting from only the *intended use* of its product. The standard actually is the intended and reasonably foreseeable use of the product. See *Arbet v. Gussarson* (1975), 66 Wis. 2d 551, 225 N.W.2d 431; *Schuh v. Fox River Tractor Co.* (1974), 63 Wis. 2d 728, 218 N.W.2d 279.

However, defendant's instruction no. 12 also contained a proposed definition of these terms. It stated:

> "The jury is instructed not to find the defendant, Hyster Company, liable unless the product which it sold was in a defective condition, unreasonably dangerous to the user or consumer.
>
> By defective condition is meant a condition not expected by the purchaser which then renders the product unreasonably dangerous for its intended or foreseeable use.
>
> To be unreasonably dangerous, the product must be dangerous to an extent beyond that which would be expected by the ordinary user with the ordinary knowledge common to the community as to its characteristics."

This instruction too was refused. While we find nothing objectionable in this statement, we do not believe the failure to give this instruction constitutes reversible error. The jury was adequately instructed that it could not find Hyster liable unless it found the S40-B truck had left Hyster's hands in a defective condition unreasonably dangerous to the user, and that plaintiff had a duty to avoid open and obvious hazards. A review of all the instructions leads us to believe that all the issues in the case were fairly covered by the instructions given. See *Gaenzele v. B. E. Wallace Products Corp.*

Furthermore, we note no decision in Wisconsin which requires that such a definitional instruction be given the jury. Hyster points out that the wording of its instruction no. 12 was taken directly from *Netzel v. State Sand & Gravel Co.* (1971), 51 Wis. 2d 1, 186 N.W.2d 258, wherein it was cited with approval. However, we note that the question in *Netzel* in this regard was whether the jury was adequately instructed that it must first find a defect in the product before holding the manufacturer liable. The court there stated that this instruction fulfilled that function. It did not indicate that a court need define the terms "defective condition" and "unreasonably dangerous" before a jury could properly apply the Wisconsin test for strict liability.

Lastly, Hyster also contends that the trial court erred in instructing the jury that the manufacturer's duty in a strict products liability case may not be delegated to another. Specifically, Hyster points to plaintiff's instructions nos. 13 and 14, which stated respectively that:

> "The manufacturer has the obligation to manufacture and sell a product which is not in a defective condition and unreasonably dangerous. Since that obligation cannot be delegated to another, it is not a defense for the manufacturer that another person, including the plaintiff's employer, failed to make the product properly."

> "When I use the terms 'cannot be delegated' in these instructions, I mean that the duty must be performed by the person upon whom it is placed and cannot be left to some other person or individuals, including plaintiff's employer."

We think such instructions were properly given.

■■ It is a fundamental principle of strict tort liability that the duty to design and manufacture a reasonably safe product may not be delegated by the manufacturer to the dealer, purchaser, or user. (See *Rios v. Niagara Machine & Tool Works* (1974), 59 Ill. 2d 79, 319 N.E.2d 232, and cases cited therein.) Under section 402A the entire focus is on the condition of the product when it left the manufacturer's hands. Implicit in this focus is the concept that the manufacturer's duty is nondelegable.

While no Wisconsin cases have apparently addressed this issue directly,

we believe this concept of nondelegability is necessarily applicable to Wisconsin's use of 402A. All members in the chain of distribution of a product may be liable under 402A. Thus, the Wisconsin Supreme Court has emphasized that "[t]he original seller has a duty to market a reasonably safe product, and this duty is breached each time the defective or dangerous product is sold." (*Barter v. General Motors Corp.* (1975), 70 Wis. 2d 796, 804, 235 N.W.2d 523, 527.) Hyster could not delegate its duty to produce a reasonably safe lift truck to Chilton, plaintiff's employer.

Our belief that instructions on the nondelegability of Hyster's duty in this case were proper is reinforced by the recent decision of the United States Court of Appeals for the Seventh Circuit, applying Wisconsin law, in *DeSantis v. Parker Feeders, Inc.* (7th Cir. 1976), 547 F.2d 357. In that case, the minor plaintiff was injured when he became trapped in the auger of a cattle feeder which had no safety cover. Relevant to the instant issue, the *DeSantis* court stated:

> "That other parties may also have been negligent in regard to the DeSantis' cattle feeder in no way absolves Parker Feeders from the duties it had to those injured by its products when they were incorporated in such feeders." (547 F.2d 357, 364.)

We believe this is an accurate statement of section 402A principles applicable to Wisconsin law. Therefore, the instructions given in the instant case are appropriate.

For all the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.