CANDIDO RIVERA, Plaintiff-Appellee, *v.* ROCKFORD MACHINE & TOOL COMPANY, Defendant-Appellant.

(No. 54002;

First District—September 27, 1971.

642

Gerard E. Grashorn, of Chicago, (Edward J. Wendrow, of Winston, Strawn, Smith & Patterson, of counsel,) for appellant.

Frank J. Mackey, Jr., of Chicago, (Sidney Z. Karasik, of counsel,) for appellee.

Mr. JUSTICE LYONS delivered the opinion of the court:

This is an action for damages for personal injuries brought against the manufacturer of a plastic injection molding machine, known as the Rockford Hijector, by a machine operator who suffered the loss of his right hand. The cause was submitted to a jury under the theory of strict liability and resulted in a verdict for plaintiff in the amount of $155,000 upon which judgment was entered.

On appeal the defendant contends:

1) That the verdict on the issue of liability is erroneous as a matter of law;

2) That the trial court erred in admitting plaintiff's evidence that certain safety devices were available at the time the machine involved was manufactured and sold which would have prevented the occurrence;

3) That the court erred in allowing plaintiff's counsel to use certain published material in cross-examining a defense witness;

4) That the court erred in denying defendant's motion to strike the testimony of one of plaintiff's expert witnesses;

5) That the jury was not properly instructed; and

6) That the verdict is excessive and therefore any affirmance must be conditioned upon a remittitur.

The statement of facts will be restricted to only that which we deem necessary for purposes of the appeal. The machine on which plaintiff was injured, a Rockford Hijector, is a plastic injection molding machine manufactured and sold by the defendant. In function it is essentially a horizontally operating hydraulic press, the right side of which is stationary. One half of a die or mold is secured to each side of the press and heated to approximately three hundred degrees Fahrenheit.

As the machine was used on the date of plaintiff's injury, plastic material, which had been heated until a desired degree of softness had been achieved, was manually placed in the cavities of the right side of the mold by the machine operator. The machine cycle is then begun by the closing of a safety gate which is mounted on rollers and which, when in a closed position, physically bars the operator from the mold area. When the gate is placed in the closed position certain electronic limit

switches are activated and the machine's cycle is begun. Until these switches have been activated by the gate, the machine is said to be electrically "dead."

The cycle of the machine consists of the movement by hydraulic means of the left half of the die to meet the right half. The two halves of the die are then pressed together under a force of several tons, thus forcing the plastic material to assume the contours of the mold. The machine remains in this position for a short period, allowing the newly formed product to become heat cured. Thereafter, the left or movable half of the die is automatically retracted and knock out pins in the mold loosen the product in order to facilitate its manual removal by the machine operator, after the safety gate has been opened.

The machine is so designed that the safety gate cannot be opened once the machine's cycle has begun. Once closed, the gate can be returned to the open position, allowing access to the mold area, only after the cycle has been completed and the press returned to the open position.

The hydraulic system which provides the force for movement of the left half of the die and molding pressure consists of a single cylinder and piston. At the end of the piston rod opposite the piston is a platen to which is secured the left half of the mold. The piston, and thus the left half of the mold by reason of its connection thereto through the platen and piston rod, is moved by the transfer of hydraulic fluid under pressure from one side to the other of the piston within the cylinder. Under this arrangement some pressure is maintained on both sides of the piston at all times.

On the morning of his injury, plaintiff, an experienced operator, had run about six "shots" (cycles of the machine) and was in the process of removing the product from the machine when the mold unexpectedly closed on his right hand. The hand was burned to the extent that it had become proteinurized (described by the doctor as "the temperature had coagulated the protein much like when you boil an egg, the yolk becomes hard and white. * * * instead of being hard and white, was hard and black.") requiring amputation. Subsequent examination of the machine revealed that the piston rod had fractured at a point inside the cylinder. The connection between the piston and the platen having been thus severed, pressure within the cylinder caused the platen and mold to return to the closed position.

The rod which broke on the date of plaintiff's injury was not an original component of the machine, but was manufactured and installed on some prior date by plaintiff's employer.

■■ The first premise upon which defendant bases its contention that

the jury's verdict is erroneous as a matter of law is the contention that the evidence established the proximate cause of plaintiff's injury to be the failure of the piston rod, a component of the machine with which defendant had no contact since it was a replacement item manufactured and installed by plaintiff's employer following an earlier failure of the original rod. It is further contended in this regard that the only evidence with respect to the cause of the replacement rod's failure points to faulty maintenance on the part of plaintiff's employer. The maintenance referred to is that of the piston guide shoes which, if allowed to wear, could cause extraordinary stress to be exerted upon the rod. Thus, defendant argues that the evidence established negligence on the part of plaintiff's employer as the sole proximate cause of his injuries. Such a defense was held to be available to a defendant in a strict liability case in *Santiago v. Package Machinery Company* (1970), 123 Ill.App.2d 305, 260 N.E.2d 89.

■■ We believe that plaintiff's theory of the case, that the machine was defective in design and that the defect was the sole or at least a contributing cause of his injuries was sufficiently supported by the evidence to warrant submission of the question of causation to the jury. In this connection we note that defendant's assertion that the only evidence received as to the cause of the piston rod's failure points to negligence on the part of plaintiff's employer is seriously misleading. There was evidence to the effect that the guide shoes on the machine had not been replaced for some period of time and that if they were allowed to become worn their deteriorated condition could cause extraordinary stress to be placed on the piston rod. However, there was no evidence which tended to establish that the guide shoes were in fact in a deteriorated condition. Moreover, while plaintiff did not offer evidence to establish the actual cause of the rod's failure, his expert witness Blair testified that if the guide shoes were in fact in a deteriorated condition and unusual stress on the piston rod resulted, the rod would not have broken where it did, inside the cylinder, but rather at the toggle joints which were located outside the cylinder. This judgment was based upon the location of the guide shoes and the structure of the rod. In addition this witness testified that the fact that this was not the first instance of rod failure indicated to him that the cause was due to some defect in design.

Defendant has also asserted that the judgment must be reversed as a matter of law since the evidence does not establish a violation of a duty which it owed to the plaintiff. In support of this proposition it is argued that a manufacturer is exposed to no greater liability under strict liability theory as announced in *Suvada v. White Motor Company* (1965), 32

Ill.2d 612, 210 N.E.2d 182 than under common law negligence theory. Therefore, it is argued, defendant cannot be held liable under plaintiff's evidence, which is characterized as merely evidence that it was possible to have manufactured a safer machine. Similarly, it is also argued that the question of whether defendant was under a duty to incorporate into the design of its machine either or both of the safety devices (hydraulic interlock and interference bar) the absence of which, under plaintiff's theory of the case rendered the Hijector unreasonably dangerous, was a question of law for the court which should have been answered in the negative.

■■ While we might agree that a manufacturer's actual liability exposure was not expanded by *Suvada* and that under the doctrine of strict liability in tort as announced therein under the doctrine of strict liability in tort as announced therein plaintiff cannot recover merely on evidence that it was possible to have manufactured a safer product, our concurrence would be of no aid to the defendant. While it is true that the question of whether a duty exists is a question of law for the court, the only duty with which the court is concerned in a strict liability case is the defendant's duty to place into the stream of commerce only those articles which are not unreasonably dangerous when used for their intended purpose. This was the sole duty imposed. Resolution of the question of whether defendant's machine was unreasonably dangerous for failure to incorporate certain safety devices which plaintiff's evidence shows were available at the time the Hijector left defendant's control was the function of the jury as trier of fact. Their finding as to this question, when considered in connection with defendant's duty, determines the issue of liability. *Evans v. General Motors Corporation* (1966), 359 F.2d 822, relied upon by defendant, illustrates the principle. There the court of appeals properly upheld the trial court's determination that plaintiff's complaint failed to state a cause of action under strict liability theory since the manufacturer's duty as outlined in *Suvada* was not truly involved. In that case plaintiff contended that defendant was liable for injuries which she sustained by reason of an occurrence which could not be construed as a consequence of the normal intended use of defendant's product, i.e., a collision with another automobile. There exists no similarity between *Evans* and the present case with respect to the duty alleged to be breached.

■■ While we agree with defendant that a plaintiff cannot recover under strict liability theory merely on evidence that it was possible to have manufactured a safer product, we cannot accept the further contention that it is improper to admit evidence concerning the availability, at the time the product in question left defendant's control, of methods

or devices not adopted. In the negligence cases relied upon by defendant the question to be resolved by the trier of fact was whether a particular act or procedure was reasonable. Thus, evidence of alternative methods were not relevant. Such is not the case, however, under strict liability theory where the question of whether particular acts were negligent does not arise.

■■ Neither do we believe that evidence of this nature need be restricted to proof of the custom or general usage in the industry. The public policy considerations which provided the foundation upon which the *Suvada* decision was based require that the trier of fact be allowed to consider methods and devices which were available, although not generally adopted, in determining whether the danger to which plaintiff was exposed by reason of his use of the defendant's product was unreasonable. (See *Moren v. Samuel M. Langston Company* (1968), 96 Ill.App.2d 133, 237 N.E.2d 759.) If such were not the case, manufacturers would be free to ignore the risks attendant to the use of their products secure in the knowledge that their own failure to adopt new developments, techniques or devices to practical use will shield them from liability. We find the statement of Mr. Justice Learned Hand, made in another connection, to be appropriate in this regard:

"There are, no doubt, cases where the courts seem to make the general practice of the calling the standard of proper diligence * * *. Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. *The T. J. Hooper, et al. v. H. N. Hartwell and Son* (1932), 60 F.2d 737, 740.

■■ Neither do we accept defendant's contention that such evidence is improper since a manufacturer is not obliged to adopt every new safety device which may be developed. A manufacturer is required to adopt any and all devices the absence of which render his product unreasonably dangerous.

Defendant also contends that the trial court erred in allowing plaintiff's counsel to cross-examine defense witness Alden as though he were offered as an expert by reading certain passages from a book on die casting and an article which appeared in the December, 1945, issue of "Industrial Plastics", a trade journal identified by Alden himself as reputable. The authoritative character of the publications is not questioned here. On direct examination Alden testified extensively with respect to his background in the plastic molding field and knowledge of the safety devices used by other manufacturers of injection molding machines at the time the machine on which plaintiff was injured was manufactured and sold. He was a part owner of and in charge of pro-

duction of the company which was the predecessor of plaintiff's employer. He was not aware of any manufacturer's use of either a hydraulic safety device or a mechanical interference bar which would prevent the mold from closing in the event of rod failure. He also testified that he was in fact the inventor of the machine known as the Rockford Hijector and had received a patent thereon.

■■ In view of Alden's testimony on direct examination concerning his background, familiarity with the safety devices used by other manufacturers of injection molding machines, and his having invented the machine involved in this case, we do not believe that the trial court abused its discretion in allowing the cross-examination complained of.

Defendant's next two points deal with the examination and testimony of plaintiff's expert witness, Salzenstein. He was the second of plaintiff's witnesses to testify that in 1951 when the machine on which plaintiff was injured left defendant's control there were in existence certain devices which would prevent the die halves from closing in the event of rod failure. The first of these was in the nature of a physical barrier to movement of the left half of the die (a drop or interference bar) and the second a hydraulic valve which could be operated by means of either an electrical or air solenoid. The valve would serve to reduce the hydraulic pressure in the cylinder to zero.

During the course of his examination of Salzenstein, plaintiff's counsel, over objection, was allowed to read a passage from an article in a trade journal which described a hydraulic safety interlock linked to the electrical system of a machine. The witness, again over objection, was allowed to interpret the language of the article. On cross-examination the witness stated that his testimony with regard to the linking of hydraulic and electrical systems was based entirely on the article which plaintiff's counsel had read.

■■ Defendant contends that given this "admission" by the witness it was error to deny his motion to strike Salzenstein's entire testimony. We do not agree. The rationale behind defendant's argument is that the "admission" by Salzenstein established his testimony as hearsay in its entirety. A fair reading of the record, however, indicates to us that what defendant has characterized as Salzenstein's "admission" related solely to that portion of his testimony wherein he interpreted the language of the article which was read to him. Thus the question of whether it was error to deny defendant's motion to strike the testimony as hearsay can be considered only with respect to that portion of it to which the "admission" applies.

■■ Defendant's argument is that the article itself was not admissible as independant proof of the facts stated therein by reason of

operation of the hearsay rule. Thus, it was error to allow that material to come before the jury indirectly by allowing the witness to state his interpretation thereof. In *Santiago,* cited above, this court allowed a considerable relaxation of the hearsay rule in the presentation of evidence of custom in the industry. In view of our determination that under strict liability evidence beyond the scope of custom is admissible for similar purposes, the same reasoning with respect to relaxation of the hearsay rule also applies. In any event, that small portion of Salzenstein's testimony, when considered in perspective with the entirety of plaintiff's evidence is so insignificant that any error which may have occurred in allowing it to stand is clearly insufficient to require reversal.

■■■ Defendant also contends that the trial court's refusal to give certain instructions constitutes reversible error since without them the jury was left uninstructed on both the scope of a manufacturer's duty under strict liability theory and defendant's theory of the case with respect to the proximate cause of plaintiff's injury. We find the first portion of this argument to be semantic only. While it is true that the instructions given to the jury did not include the term "duty," the jury was fully advised of the scope of a manufacturer's liability exposure under strict liability theory. Neither do we find merit in the contention that the jury was not instructed on defendant's theory of proximate cause. The instruction on proximate cause which was given, taken together with the instruction on the elements which plaintiff must prove in order to recover, was clearly sufficient to place defendant's theory before the jury.

■■■ Finally, defendant contends that the verdict is excessive and that therefore any affirmance should be conditioned upon a substantial *remittitur.* The assessment of damages is a function of the jury and therefore reviewing courts will not lightly disturb their findings. Thus it has been held that a court of review should not disturb the jury's assessment of damages in a personal injury suit unless it appears that the jury was improperly instructed on the issue of damages or that the verdict is the result of passion or prejudice. (See *Olson v. Fleetwood* (1970), 116 Ill.App.2d 411, 254 N.E.2d 271.) Defendant does not contend that the jury was improperly instructed on damages. The substantial medical evidence contained in the record with respect to the extent of the amputation, decreased mobility of the remaining forearm, plantiff's inability to adapt to the use of a prosthetic device, and post operative effects coupled with the evidence on loss of income precludes a finding that the verdict was the result of passion or prejudice.

Judgment affirmed.

BURKE, P. J., and GOLDBERG, J., concur.