Kate **MAHONEY, Administrator of the Estate of Lawrence Alfred Mahoney, Deceased, Plaintiff-Appellant,**

v.

**ROPER–WRIGHT MANUFACTURING COMPANY, INC., Defendant-Appellee.**

No. 72–1338.

United States Court of Appeals, Seventh Circuit.

Argued April 12, 1973.

Decided Dec. 12, 1973.

---

Edwin W. Sale, Kankakee, Ill., for plaintiff-appellant.

Joseph P. Skowronski, Jr., Danville, Ill., for defendant-appellee.

Before HASTINGS, Senior Circuit Judge, CUMMINGS, Circuit Judge, and CAMPBELL, Senior District Judge.*

WILLIAM J. CAMPBELL, Senior District Judge.

This diversity action was commenced by the plaintiff, the Administrator of the Estate of Lawrence Mahoney, deceased, for the alleged wrongful death of the decedent. Recovery was sought on the basis of strict liability in tort. The judgment was entered for the defendant following the return of a jury verdict in its favor. The plaintiff has appealed and contends that the district court erred in excluding certain testimony offered by two of the plaintiff's witnesses and in preventing the plaintiff from calling as a rebuttal witness an expert not identified on the plaintiff's list of witnesses filed prior to trial.

As they relate to the issues raised on appeal, the facts show that in 1966 Lawrence Mahoney purchased a John Deere Model 55 EB self-dash propelled combine equipped with an automatic header control unit manufactured and sold by the defendant. The defendant's control device is designed to automatically regulate the height of the combine's cutting bar during harvesting operations. The defendant's system had been installed on the combine prior to its delivery by the local John Deere dealer.

The header control system consists essentially of three components, a feeler bar, a selector control valve, and the operator control. The purpose of the system is to keep the head of the combine as near to the ground as possible when harvesting over uneven ground. The feeler bar, which appears somewhat like the head of a rake, is attached under and parallel to the cutting bar of the

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

combine head. It consists of twenty-four fingers, each about eight inches in length, which function as guides to the control system, by mechanically communicating any changes in ground contour to the selector control valve. This communication is accomplished through a cable connected to both the feeler bar and the selector control valve.

The selector control valve is a hydraulic valve which directs the flow of hydraulic oil alternatively to two separate hydraulic lines. This is done by means of a spool valve which moves within the selector control valve, covering and uncovering inlet and outlet ports depending on the signals it receives from either the feeler bar or the operator control.

The selector control valve assembly is mounted on the combine with the spool valve in a vertical position. In such a position, the control system is in the manual mode and the height of the combine head is then controlled manually by the operator with the regular John Deere hydraulic control. When the spool valve is in the lowered position, the control system becomes automatic and the movement of the fingers and feeler bar thereby control the height of the combine head independently of the operator.

If the control system is in the automatic mode and the combine passes over a depression in ground contour, the fingers of the feeler bar drop lower, causing the cable between the feeler bar and the selector control valve to be pulled downward. This in turn causes the spool valve to drop and divert the flow of hydraulic oil so that the hydraulic rams under the combine head retract, lowering the head. The reverse will occur when the combine passes over an elevated section of ground.

In addition to the cable between the feeler bar and the selector control valve, there is a second cable which runs from the selector control valve to the operator's platform on the combine. This cable permits the operator to place the header control system in either automatic or manual mode by means of a push-pull knob. When the knob is pulled the spool valve is raised and the system is in the manual mode. When the knob is pushed, the spool valve is lowered and the system is then in the automatic mode.

From the time of its purchase in 1966 until October 25, 1969, the combine equipped with the defendant's system had been used without incident. On the latter date, the decedent had been harvesting soybeans with the combine, and after he had eaten lunch in the field with two of his sons, the sons departed on errands. When the oldest son returned, he discovered his father crushed under the head of the combine. The decedent was found lying on his back with his feet and torso below his chest extending out at a right angle to the side of the combine head. The combine engine was running. The precise circumstances which led to the death are unknown since no one witnessed what occurred that day.

Plaintiff's case was premised on the theory that the automatic header control system as manufactured and sold by the defendant was unreasonably dangerous and that this caused Lawrence Mahoney's death. Specifically, plaintiff's complaint charged that the header control device contained no positive safety devices to prevent the combine header from moving independently of operator control. The record discloses that as the combine was manufactured by John Deere, it was equipped with an angle iron brace for the purpose of providing a positive lock on the hydraulic rams used to raise the combine header. The installation of the defendant's header control system necessitated the removal of the John Deere safety device. In order for the header on a machine equipped with the defendant's system to remain in an elevated position regardless of the position of the selector valve, a hydraulic arrangement was employed. This arrangement was effective as long as the combine engine did not exceed a certain RPM, approximately 1400. If this RPM rate was exceeded when the

engine was at a fast idle, the selector control valve could drop from the manual to the automatic mode and the combine head would immediately drop to the ground.

Plaintiff's expert testified that the change from manual to automatic was effectuated by the selector control valve which operated by means of a spool valve which directed the flow of hydraulic fluid. The expert further related that the spool valve was secured in place only by the friction of two rubber "O" rings and that a force of as little as two to five pounds would be sufficient to move it. Engine vibration could provide enough force in the expert's opinion to cause the spool valve to drop from the manual to the automatic mode. It was the expert's view that the easy movement of the spool valve constituted an improper design since, with the combine motor operating at a fast idle and the combine header elevated, the header could unexpectedly fall when the spool valve dropped.

Through a formal offer of proof, the plaintiff attempted to show through the expert's testimony that there were three relatively simple designed alternatives which could have remedied the claimed defect. The proposed evidence was objected to on the ground that evidence that it was possible to build a safer product is inadmissible. The district judge excluded the evidence, stating that "what might or could have been done was not in issue."

■ This is a diversity case in which Illinois law controls. The proof here was offered for the purpose of showing that it would have been feasible for defendant to have corrected the claimed defect in his product. The offer of proof indicates that a mechanical lock device on the operator control could have been installed and would have prevented the spool valve from dropping, that the hydraulic hoses could have been reversed with the result that if the spool valve dropped, the machine would have gone into the manual rather than the auto-

matic mode of operation, and that the spool control valve could have been mounted so that it would not be affected by gravity. The offer also showed that a mechanical lock device has been installed on a subsequent model of defendant's control system.

■■ In products liability cases, the law in Illinois for some time now has permitted the introduction of evidence which consists of alternate design feasibility or post-accident design changes. The evidence is admissible if the design alternative or design alteration was available at the time the defendant's product was manufactured and sold. See Moren v. Samuel M. Langston Company, 96 Ill.App.2d 133, 237 N.E.2d 759 (1968); Rivera v. Rockford Machine and Tool Company, 1 Ill.App.3d 641, 274 N.E.2d 828 (1971); Sutkowski v. Universal Marion Corp., 5 Ill.App.3d 313, 281 N.E.2d 749 (1972); Wallner v. Kitchens of Sara Lee, Inc., 419 F.2d 1028 (7th Cir. 1969). Although the defendant here protests to the contrary in its brief, the offer of proof clearly reveals that the design alternatives suggested by the witness were available at the time the defendant's header control device was manufactured and sold to the plaintiff's decedent.

Relying principally on Day v. Barber-Colman Co., 10 Ill.App.2d 494, 135 N.E. 2d 231 (1956), the defendant contends that evidence as to ways of designing a safer product is not admissible. In Day, the evidence showed that the design alternative there mentioned was not available at the time the defendant placed its product in the stream of commerce. Moreover, Day was tried on a negligence theory rather than on the theory of strict liability in tort. The products liability cases cited above and pursued on a theory of strict liability all held that evidence of design alternatives and post-accident design changes is admissible to show what was feasible and what the defendant knew or should have known.

■■ As one Illinois court has put it, although a manufacturer need not

adopt every new safety device which may be developed, "a manufacturer is required to adopt any and all devices the absence of which render his product unreasonably dangerous." Rivera v. Rockford Machine and Tool Co., 1 Ill.App.3d 641, 274 N.E.2d 828, 833 (1971). Whether a defendant's product is unreasonably dangerous for failure to incorporate certain available safety devices is a question to be decided by the jury in these kinds of cases. See Rivera v. Rockford Machine and Tool Co., 1 Ill.App.3d 641, 274 N.E.2d 828, 832 (1971). Because the plaintiff here was prevented from introducing evidence of design alternatives and post-accident design changes, she was denied the opportunity to properly submit her case to the jury. The judgment for the defendant must therefore be reversed and the cause remanded for a new trial.

Since a new trial has been ordered, we should briefly comment on the plaintiff's other evidentiary point. The plaintiff offered to prove that on two occasions subsequent to the accident in issue, the combine header malfunctioned in a manner similar to that claimed to have occurred on the day of the accident. The offer of proof, however, failed to adequately demonstrate that the combine header was in substantially the same condition at the time of the alleged subsequent malfunction as it had been on the day of the accident. Under those circumstances, we agree with the district court that the evidence was not admissible. See City of Bloomington v. Legg, 151 Ill. 9, 37 N.E. 696 (1894).

We do not consider the issue concerning the plaintiff's claim that he had a right to call as a rebuttal witness an expert not identified on the list of witnesses filed prior to trial. We assume that any difficulties of this nature will be resolved prior to the new trial.

For the reasons stated, the judgment of the district court is reversed and the cause is remanded for a new trial.

Reversed and remanded.