Jack A. OBERST and Wayne G. Schroeder, Plaintiffs–Appellants,

v.

INTERNATIONAL HARVESTER COMPANY, INC., Defendant–Appellee.

No. 79–1770.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 13, 1980.

Decided Sept. 19, 1980.

William R. King, Des Moines, Iowa, for plaintiffs–appellants.

Martin H. Katz, Rock Island, Ill., for defendant–appellee.

Before FAIRCHILD, Chief Judge, and SWYGERT and CUMMINGS, Circuit Judges.

FAIRCHILD, Chief Judge.

This appeal challenges rulings of the district court on the admissibility of certain evidence. Plaintiffs–appellants Jack Oberst and Wayne Schroeder were injured in a single vehicle accident on April 16, 1975 involving a Transtar 4070A truck manufactured in 1973 by defendant International Harvester. Plaintiffs claimed that their injuries were caused by design defects in the cab of the truck, and the restraints in the sleeping compartment in the cab of the truck.

Schroeder was driving at the time of the accident. Oberst at that time occupied the sleeping compartment, but the force of the accident caused his ejection from the sleeping compartment into the seat area (and partially out a window). It was Oberst's claim that the defective design of the restraints in the sleeping compartment was responsible for his ejection from that compartment and his consequent injuries. The jury rendered a verdict for defendant. The evidentiary rulings complained of are concerned only with the bunk restraints. Because these rulings had no effect upon Schroeder's claims against International Harvester, the district court's judgment against Schroeder is accordingly affirmed.

The bunk restraint on the truck consisted of two vertical straps, placed about 36 inches apart at the front of the sleeping compartment, which were permanently attached to the floor and roof of the cab of the truck. Upon objections made by the defendant, the district court barred introduction of evidence regarding the types of restraining devices commercially available when defendant manufactured the Transtar 4070A, the kind of bunk restraint tested in a film seen in 1971 by engineering employees of the defendant, and post–accident change by the defendant of the type of bunk restraint installed in defendant's trucks.

Although plaintiffs were not permitted to show the types of restraints commercially available at the time of manufacture of the truck (referred to as availability) there was proof that other types of restraints, such as woven mesh, were feasible (referred to by the parties and the court as feasibility).

The bases for the exclusions of testimony and exhibits are not explicitly stated. The

district court repeatedly indicated that commercial availability of alternative bunk restraints was identical to the feasibility of alternatives; because the court viewed feasibility as not being controverted, it considered the evidence of commercial availability to be of no probative value. The court appeared to treat the post–accident design changes as inadmissible under Federal Rule of Evidence 407.

The testimony of Robert E. McAfee as plaintiffs' witness put into evidence much about feasibility of alternative designs for bunk restraints. McAfee, as chief engineer of the heavy–duty bodies for International Harvester, was responsible for deciding what bunk restraint to place in the Transtar 4070A. He testified that the purpose of the bunk restraint was to "keep the man in the bunk from being ejected during deacceleration . . . such as a panic–stop situation . . . ." McAfee claimed that one alternative restraint, the mesh type, was more effective in preventing ejection of a person from the sleeping compartment in accidents like the one involved in this case, but that such restraints would prove unnecessarily confining in other accidents, such as those involving fire or the truck going into a body of water, where speed of departure from the cab of the truck was important. McAfee further testified that he considered various methods of restraint straps,[1] all of which he considered at that time to have been feasible to install. He indicated that the mesh restraint system would have required a redesign of the roof structure of the 4070A in order to be used in 1973 by International Harvester. McAfee also testified as to the feasibility of using active rather than passive restraints in the sleeping compartment but indicated that that alternative had been rejected because such systems would have been unacceptable to the drivers and thus would not have been used had they been installed. McAfee testified further that International Harvester purchased restraining belts and belt hard-

ware from a seatbelt manufacturer. He said that commercial availability of a bunk restraint system would be a consideration in his determination of what kind of bunk restraint system to utilize.

The plaintiffs, defendant, and district court all agreed, out of the presence of the jury, that there was no dispute about the feasibility of alternative methods of bunk restraints. Plaintiffs claimed that this agreement concerned only what was theoretically able to be utilized as a restraint and that it had the right to show what restraints were actually manufactured and installed as of 1973. The plaintiffs sought a stipulation from the defendant that other identifiable types of restraints were commercially available in 1973, but the court said that such a stipulation would be prejudicial and have no probative value.

■ This court, applying Illinois law regarding proof in a products liability action, indicated that the plaintiffs must prove, *inter alia*, that "(1) the product as designed is incapable of preventing the injury complained of; (2) there existed an alternative design which would have prevented the injury; and (3) in terms of cost, practicality and technological possibility, the alternative design was feasible." *Lolie v. Ohio Brass Co.*, 502 F.2d 741, 744 (7th Cir.1974). Feasibility includes "the elements of economy, effectiveness and practicality," and may be shown "by the opinions of experts or by the existence . . . on other products or in the design thereof . . . ." *Sutkowski v. Universal Marion Corp.*, 5 Ill.App.3d 313, 319, 281 N.E.2d 749, 753 (1972). Whether commercial availability is viewed as an element of feasibility or as a separate issue, it is clear that proof of commercial availability of an alternative design is evidence of a material fact involved in a products liability action.

■ Because the evidence of design alternatives available in 1973 was relevant and there existed no valid policy reason for

1. Q. What types of bunk restraint arrangements did you look at?
A. It was single–strap types, double–straps, lap–belt types, mesh, harnesses . . . . Great

number of different types and feasibility of using different types was explored.

excluding it,[2] the evidence should have been admitted. The jury, however, was permitted to hear testimony that defendant's employees were familiar with alternative designs in 1973, found some of the alternatives to have advantages over the restraint actually installed, and chose to use the vertical bunk restraints after weighing the advantages and disadvantages of the different systems of restraints. This evidence creates such a strong implication that the design alternatives were commercially available, that the evidence offered may have been cumulative[3] and, in any event, that its exclusion was not reversible error.[4]

■ It is a long–established rule that proof of repairs subsequent to an accident is not admissible to prove negligence in a tort action. Such evidence may, however, be introduced, for other purposes. Federal Rule of Evidence 407 provides:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

■ Appellants contend that Rule 407 is inapplicable to actions asserting strict liability. They contend that the first sentence of the Rule applies only to actions involving negligence or culpable conduct, which obviously do not include strict liability actions, and that the second sentence of the Rule merely creates an exception to the first sentence. On their theory, evidence of subsequent repair would be admissible for any purpose in a strict liability action. The weight of authority in Illinois rejects this theory.[5] The exclusion of the post–accident change in bunk restraint design is not reversible error.

Rule 407 allows evidence of the post–accident change in design to show feasibility of an alternative design only if feasibility was controverted. Here it was not. We see no way in which the exclusion affected the substantial right of Oberst.

The evidentiary exclusions, if error, constitute harmless error as to Oberst's claims.

---

2. The evidence of which restraints were employed in 1973 by specific manufacturers may have been properly excluded because the prejudice to defendant would have outweighed the probative value of that evidence. Federal Rule of Evidence 403. What was of probative value was that in 1973 International Harvester could have purchased alternative bunk restraints.

3. Federal Rule of Evidence 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

4. Fed.R.Civ.P. 61 provides in part:
No error in either the admission or the exclusion of evidence . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

5. Numerous cases interpreting Illinois law have indicated that proof of post–accident repair or design change is admissible in a strict liability action to show feasibility of an alternative design. *Lolie v. Ohio Brass Co.*, 502 F.2d 741, 745 (7th Cir.1974); *Mahoney v. Roper–Wright Manufacturing Co.*, 490 F.2d 229, 232 (7th Cir. 1973); *Smith v. Verson Allsteel Press Co.*, 74 Ill.App.3d 818, 828, 30 Ill.Dec. 562, 570, 393 N.E.2d 598, 606 (1979); *Cunningham v. Yazoo Manufacturing Co.*, 39 Ill.App.3d 498, 500, 350 N.E.2d 514, 516 (1976); *Gaenzele v. B. E. Wallace Products Corp.*, 39 Ill.App.3d 93, 99, 350 N.E.2d 571, 576 (1976); *Biehler v. White Metal Rolling & Stamping Corp.*, 30 Ill.App.3d 435, 445, 333 N.E.2d 716, 724 (1975); *Sutkowski v. Universal Marion Corp.*, 5 Ill.App.3d 313, 319, 281 N.E.2d 749, 753 (1972). One Illinois case held that the traditional exclusion of post–accident repairs was inapplicable in strict liability actions. *Burke v. Illinois Power Co.*, 57 Ill. App.3d 498, 514, 15 Ill.Dec. 670, 685, 373 N.E.2d 1354, 1369 (1978). However, *Burke* relied for authority on *Sutkowski* and *Mahoney*, which do not support this holding.

These rulings did not affect the claims of Schroeder. Accordingly, the Clerk of this Court is directed to enter judgment affirming the judgment of the district court.

SWYGERT, Circuit Judge, concurring and dissenting, in part.

I agree with the majority that the disputed evidentiary rulings had no effect upon Schroeder's claims. Therefore, I concur in the affirmance of the judgment against him. With respect to Oberst, however, I respectfully dissent.

For convenience and clarity, the evidentiary issues presented may be classified as

1. Relying upon Fed.R.Evid. 403 and Fed.R. Civ.P. 61, the majority concludes that the proffered pre–accident evidence (i. e., evidence of the bunk restraint systems known by International Harvester to be commercially available when the 4070A was being designed) was cumulative and that its exclusion was not reversible error. *Ante* at 865. Although I agree that the exclusion of this evidence alone would not warrant a reversal, I believe that the majority's conclusions regarding this evidence are incorrect in light of the trial court's other evidentiary rulings, which I perceive to be erroneous.

2. The question whether the admissibility of the disputed evidence is governed by state or federal law is a difficult one. *See generally* O.G. Wellborn III, *The Federal Rules of Evidence and the Application of State Law in the Federal Courts*, 55 Tex.L.Rev. 371 (1977). This action was commenced after the effective date of the Federal Rules of Evidence. *See* P.L. 93–595, § 1, 88 Stat. 1926 (January 2, 1975). Generally, even in a diversity case such as this, the Federal Rules of Evidence govern all evidentiary questions, except where they specifically refer to state law. *Pollard v. Metropolitan Life Ins. Co.*, 598 F.2d 1284, 1286 (3d Cir.), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 171 (1979) (admission of documents); *accord, Johnson v. William C. Ellis & Sons Iron Works*, 604 F.2d 950, 957 (5th Cir. 1979); *Gibbs v. State Farm Mutual Ins. Co.*, 544 F.2d 423, 428, n. 2 (9th Cir. 1976); *see, e. g.*, Fed.R.Evid. 302, 501. Unlike most of the other Federal Rules of Evidence, however, Rule 407 is based primarily upon policy considerations, and not upon relevancy or concern for truth finding. *Advisory Committee Notes*, Fed.R.Evid. 407. *See also* Fed.R.Evid. 408 (compromise and offers to compromise). For this reason, it is debatable whether Rule 407 or a conflicting state rule should govern in a diversity case. *See* 2 *Weinstein's Evidence* ¶ 407 [objections of Prof.

pre–accident and post–accident. My primary dispute is with the majority's treatment of the post–accident evidence [1] which consists of proof of the fact that in 1976 International Harvester began installing a different bunk restraint system in its model 4070A trucks. The new, mesh–type system was one which International Harvester knew to be commercially available before the accident. The majority discusses the admissibility of this evidence under both Fed.R.Evid. 407 and Illinois law and determines that it was inadmissible under both. *Ante* at 865–866 & n. 5. I disagree with these determinations.[2]

Schwartz to Rule 407 at Hearings Before the Subcommittee on Criminal Justice, House Committee on the Judiciary, 93rd Cong., 1st Sess., Rules of Evidence (Supp.), Ser. No. 2, p. 303 (1973)]; *Wellborn, supra; see generally* McCormick, *Evidence* § 275 (2d ed. 1972). This question apparently has not been addressed directly by any federal court, but the Fifth Circuit's analysis in *Conway v. Chemical Leaman Tank Lines, Inc.*, 540 F.2d 837 (5th Cir. 1976) (on rehearing) is of assistance. There, the court was faced with a Texas rule of evidence which permitted the impeachment of a widow suing for the wrongful death of her husband with proof of the fact of her subsequent ceremonial marriage. Apparently using a balancing analysis under Fed.R.Evid. 403, the district court refused to permit such impeachment. The Fifth Circuit reversed, saying that the Texas rule was a rare state rule of evidence which was so intimately related to state substantive law that it should be applied in a diversity action to prevent forum shopping. Another example of such a rule might be the parol evidence rule which is widely considered to be a part of the law of contracts, although it is couched in terms of the law of evidence. *See* Wigmore, *Evidence* § 2400 (3d ed. 1940).

The Supreme Court recently has reaffirmed the analysis of problems such as the one presented here, which was set forth in *Hanna v. Plummer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). *See Walker v. Armco Steel Corp.*, 446 U.S. 740, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980). Pursuant to that analysis, where, as here, a federal and state rule both govern the issue in dispute and are in conflict, the federal rule is applied in a diversity case if it is arguably procedural. But, where there is no pertinent federal rule, usually a specific state rule will be applied. *See, e. g., Walker, supra* (method of commencing action for purposes of statute of limitations controlled by state law rather than by Fed.R.Civ.P. 3). In *Conway,*

*Admissibility Under Rule 407*

As the majority notes, Oberst "contend[s] that Rule 407 is inapplicable to actions asserting strict liability." *Ante* at 866. The validity of this contention will be discussed below. Even apart from it, the proffered evidence was admissible under Rule 407, which permits the admission of evidence of subsequent remedial measures to prove the "feasibility of precautionary measures, if controverted . . . ." Fed.R.Evid. 407. "[F]easibility includes 'the elements of economy, effectiveness and practicality . . . .'" *Ante* at 865 (citation omitted). For it to be uncontroverted within the meaning of Rule 407, the defendant's concession must be unequivocal. 2 *Weinstein's Evidence* ¶ 407[01]. The majority concludes that feasibility was not controverted. The record refutes this conclusion.

Virtually all of the evidence regarding feasibility was presented in the testimony of Robert E. McAfee, who was in charge of designing the 4070A. According to the majority, McAfee testified that the mesh–type system "would have required redesign of the roof structure of the 4070A in order to be used in 1973 by International Harvester." *Ante* at 865. Thus, McAfee's testimony is not unequivocal as to the economy element of feasibility. Regarding effectiveness, McAfee testified that the mesh system "was more effective in preventing ejection of a person from the sleeping compartment in accidents like the one involved in this case, but that such restraints would prove unnecessarily confining in other accidents . . . where speed of departure from the cab of the truck was important." *Id.* McAfee also testified that the alternative systems would have been less likely to be used than the two–belt system. *Ante* at 864–865. Consequently, McAfee's testimony may not fairly be characterized as unequivocal as to the effectiveness component of feasibility. In fact, McAfee was unequivocal only as to the fact that the mesh system was considered to be technically possible to install. The single concession was not sufficient to preclude admission of the proffered evidence.

Under Rule 407, evidence of subsequent remedial measures also may be used for impeachment. McAfee's testimony left the jury with the impression that International Harvester weighed many factors in deciding upon the two–belt system. Oberst sought to impeach this impression by showing that the decision not to install the mesh system in the 1973 Transtar 4070A was primarily an economic one. The excluded evidence described by the majority was one part of this impeachment evidence and, as such, should have been admitted.[3] A simi-

---

application of the *Hanna* analysis was relatively simple because the federal rules were silent on the issue at hand. Therefore, the state rule applied. In this case, application of the analysis is more difficult than in Conway because the state and federal rules both govern the evidentiary problem presented. Although Rule 407 is based primarily upon policy grounds, it is arguably evidentiary (i. e., procedural). Therefore, it, and not a conflicting state rule, probably applies in a diversity case. As discussed in the text, we need not decide this question in this case because there is no conflict between Rule 407 and its Illinois counterpart.

**3.** The majority misses the full import of the proffered impeachment evidence. In addition to the evidence discussed in the text, Oberst made the following offer of proof:

Mr. McAfee would have testified that in October of 1971 he personally at International Harvester observed a movie produced by a company by the name of Hammil Corporation, a supplier of seat belts and bunk re-

straint materials, which movie illustrated an accident sequence involving a vehicle such as the 4070–A tractor and utilizing a bunk restraint system consisting of an interwoven web design as opposed to the system being used at that time by International Harvester, consisting of two single vertical straps.

That Mr. McAfee would further have testified, as he did in his deposition, that having viewed that movie in October of 1971, he assessed the capabilities of that bunk restraint system to protect against an occupant of the sleeping compartment from being involuntarily ejected from the sleeping compartment during an accident sequence and to be greater in the case of the interwoven design than in the case of the two vertical single straps.

Further, Mr. McAfee would have testified that directly related to having seen that film and the assessment by International Harvester based upon what they saw in that movie, International Harvester did in fact make a decision to utilize a restraint system which

lar form of impeachment was upheld in *Kenny v. Southeastern Penn. Transportation Authority*, 581 F.2d 351 (3d Cir. 1978), *cert. denied*, 439 U.S. 1073, 99 S.Ct. 845, 59 L.Ed.2d 39 (1979). There, a woman who was raped while waiting in an elevated public transit station claimed that there was inadequate lighting. The court held that evidence that several bulbs were replaced and new lights installed soon after the rape was admissible to counter the inference derived from the defendants' evidence that, because the lights were checked daily, the lighting was adequate. *See also Dollar v. Long Manufacturing, N.C., Inc.*, 561 F.2d 613 (5th Cir. 1977), *cert. denied*, 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978).

Moreover, as Oberst argues, Rule 407 may not even apply to strict liability actions. A literal interpretation of the rule supports this contention because, where strict liability is asserted, neither negligence nor culpable conduct need be shown. In such cases, liability depends upon the character of the product and not upon that of the defendant. *Sutkowski v. Universal Marion Corporation*, 5 Ill.App.3d 313, 281 N.E.2d 749, 753 (1972). Although many federal courts have assumed that Rule 407 does apply to strict liability actions,[4] several have held or stated that it does not. *See, e. g., Rozier v. Ford Motor Co.*, 573 F.2d 1332 (5th Cir. 1978) (dictum); *Robbins v. Farmer's Union Grain Terminal Assoc.*, 552 F.2d 788, 792 (8th Cir. 1977);[5] *Farner v. Paccar, Inc.*, 562 F.2d 518 (8th Cir. 1977) (dictum).

was in its design of the interwoven type rather than of the single strap type.

\* \* \* \* \* \*

If I may continue, your Honor, on that same point, that decision was made prior to October of 1973 as to the fact that that type of restraint system was of a better design and would be utilized by International Harvester. That in fact they began purchasing bunk restraints of that type in 1973. International Harvester's records would reflect as early as December of 1973, but simply do not reflect any further back as to when the date of purchase actually may have been.

Irrespective of having reached that decision in that point of time, International Harvester continued to use the single-strap system on the subject tractor and on the 4070–A until late fall of 1976, at which time they used–for the first time–the interwoven strap system on a tractor Model 4070–B which was the replacement model for the 4070–A, and essentially identical with some modifications in terms of improvement, in terms of overall design.

Plaintiff expects to be able to show that one, if not the primary, consideration of the reasons of why the restraints were not used earlier was that International Harvester simply chose to wait until the total concept was developed for the 4070–B, but it had already made the decision that those bunk restraints were safer in terms of preventing ejectment, exactly the language contained in the regulation which Mr. McAfee was testifying to that he felt his belts were in conformance with. Record at 323–26. In other words, Oberst sought to prove not only that the mesh system was installed after the accident, but that the decision to do so was made before the accident and that the delay was attributable purely to economic concerns. This evidence so

impeached McAfee's explanation of why the mesh system was not installed in the 1973 model 4070A trucks that it should have been admitted. Its exclusion cannot be deemed harmless error.

4. The majority's reliance upon Illinois case authority to refute the assertion that Federal Rule 407 is inapplicable to strict liability actions is puzzling. Similarly, the Seventh Circuit cases it cites are inapposite because they were decided before the effective date of the Federal Rules of Evidence.

5. International Harvester claims that the statement in *Robbins* is dictum because in that case feasibility was controverted. This characterization is inaccurate. In *Robbins*, the plaintiffs relied upon three theories of liability: negligence, strict liability and breach of warranty. On appeal, the defendant claimed, *inter alia*, that the trial court should not have admitted a letter from the manufacturer to its sales personnel. The letter was offered by the plaintiffs for two purposes. With respect to their strict liability cause of action, it was offered to show that the product was unreasonably dangerous and defective. It also was offered to show feasibility as part of the plaintiffs' proof of negligence. The defendants contended that it was inadmissible on both counts and that feasibility was not controverted. The appeals court found it unnecessary to decide whether feasibility was controverted, because it found that the evidence was properly admitted on the strict liability theory, even if feasibility was not controverted, *and that the defendants had not objected to the plaintiffs' argument to the jury* that the letter was evidence of negligence. 552 F.2d at 792.

International Harvester has also brought to the court's attention the case of *Bauman v.*

An examination of the background of the reasons for Rule 407 supports the conclusion that it is inapplicable to strict liability actions. Rule 407 is comparable to California Evidence Code § 1151. *Advisory Committee Notes*, Fed.R.Evid. 407. In the seminal case [6] of *Ault v. International Harvester Co.*, 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148 (1974) (as modified after denial of rehearing), § 1151 was held not to apply to strict liability actions. International Harvester maintains that a comparison between § 1151 and Rule 407 is improper because the California rule does not contain the second sentence found in Rule 407. It argues that *Ault* held only that evidence of subsequent repairs is admissible to prove feasibility. A close reading of *Ault* belies this contention. *Ault* was based primarily upon two grounds. First, the court construed the phrase "culpable conduct" and concluded that it did not encompass strict liability. 117 Cal.Rptr. at 814–15, 528 P.2d at 1150–51. This is the same phrase employed by the federal rule and upon which Oberst's argument turns. The *Ault* court also considered the policy underlying the rule. It concluded that whatever tendency the rule had toward achieving its policy goal in other cases, it was not sufficiently effective to justify its application in strict liability actions. 117 Cal.Rptr. at 816–17, 528 P.2d at 1152–53.

The *Ault* court's policy analysis has been widely accepted by legislatures, courts, and commentators.[7] In strict liability cases, an exclusionary rule is unlikely to achieve its ostensible objective, primarily because the exceptions to the rule make exclusion uncertain, if not unlikely. Ultimately, admissibility depends upon the effectiveness of the plaintiff's trial tactics in getting the defendant to "controvert" feasibility or opening itself to impeachment. Many defendants may be unaware of the rule. It is illogical to assume that such defendants will alter their behavior because of it. Of the defendants who are aware of the rule, most will be insured. Their insurers are likely to encourage or require them to mitigate losses by taking remedial measures, regardless of the existence of an exclusionary rule. Some remedial measures may be required by regulatory authorities. Potential defendants are not likely to violate regulatory mandates because of the lack of an exclusionary rule. *See generally Ault; Note*, 44 Cin.L.Rev. 637 (1975). With respect to the federal rule, in particular, because most products liability cases are litigated in state court, the only basis for federal jurisdiction being diversity, the coercive effect of an exclusionary rule is negligible. Consequently, safeguards other than Rule 407 should be used.[8] Finally, even if Rule 407

---

*Volkswagenwerk A.G.*, 621 F.2d 230 (6th Cir. 1980). It claims that this case supports its contention that under Rule 407 feasibility must be contested for evidence of subsequent repairs to be admissible, even in a strict liability action. *Bauman* is inapposite, however, because there the evidence of subsequent remedial measures was considered by the jury as evidence of negligence. 621 F.2d at 233. Of course, such use of the evidence was clearly proscribed by Rule 407.

**6.** *See* Note, *Ault v. International Harvester Co.–Death Knell to the Exclusionary Rule Against Remedial Conduct in Strict Products Liability*, 13 San Diego L.R. 208 (1975).

**7.** *See, e. g.*, Me.R.Evid. 407 (evidence of subsequent remedial measures admissible for any legitimate purpose even in negligence cases); Wyo.R.Evid. 407 (specifically allowing such evidence in strict liability cases); Okla.R.Evid. 407 (same as Wyoming) (discussed in Kutner, *A Comparative Outline of the Oklahoma Evi-*

*dence Code and the Federal Rules of Evidence*, 32 Okla.L.Rev. 355, 376 (1979)); *Barry v. Manglass*, 55 A.D.2d 1, 389 N.Y.S.2d 870 (2d Dept. 1976); Note, *Post–Accident Repairs and Offers of Compromise: Shaping Exclusionary Rules to Public Policy*, 10 Loy.Chi.L.J. 487, 491 (1979); Lampert & Saltzburg, *A Modern Approach to Evidence*, 189 & n.21 (1977); 2 *Weinstein's Evidence*, ' 407[02]; McCormick, Evidence § 77 (1st ed. 1954). *But see, e. g., Lavin v. Fauci*, 170 N.J.Super. 403, 406 A.2d 978, 980 (1979); *Haysom v. Coleman Lantern Co., Inc.*, 89 Wash.2d 474, 573 P.2d 785, 791 (1978).

**8.** The Federal Rules of Evidence contain such safeguards. For example, in a case in which the probative value of the evidence is outweighed by its prejudice to the defendant, it may be excluded under Fed.R.Evid. 403. Also, insofar as subsequent remedial measures are taken for reasons other than safety, the defendant may be permitted to offer proof of that fact.

does apply to strict liability actions, the factors weighing against its efficacy suggest a more generous application of the rule than either the trial court or the majority have given it in this case.

*Illinois Law*

The majority asserts that "[t]he weight of authority in Illinois" rejects Oberst's interpretation of Rule 407. *Ante* at 866 (footnote omitted). It acknowledges, however, that "[o]ne Illinois case held that the traditional exclusion of post–accident repairs was inapplicable to strict liability actions. *Burke v. Illinois Power Co.*, 57 Ill. App.3d 498, 514, 15 Ill.Dec. 670, 685, 373 N.E.2d 1354, 1369 (1978)." *Ante* at 866, n.5. The majority dismisses *Burke* as being unsupported by the cases upon which it relied, *Sutkowski v. Universal Marion Corp.*, 5 Ill.App.3d 313, 281 N.E.2d 749 (1972), and *Mahoney v. Roper–Wright Manufacturing Co.*, 490 F.2d 229 (7th Cir. 1973).

There are essentially three flaws in the majority's analysis of this issue. First, assuming *arguendo* that *Burke* is not supported by *Sutkowski* and *Mahoney*, surely the Illinois Appellate Court was free to join the trend against the exclusion of evidence of subsequent remedial measures in strict liability cases even if such a rule is contrary to prior Illinois case law. If it did so, we are required to defer to the Illinois court's interpretation of its own law. Second, *Burke* is amply supported by the two cases upon which it relied. In *Sutkowski*, the court reversed a judgment entered upon a jury verdict for the defendant, in part because the trial court excluded evidence of a post–accident modification. The plaintiff, who was crushed to death by a piece of strip mining equipment, alleged both strict liability and breach of warranty against the manufacturer. The trial court excluded the evidence because it was inadmissible to prove negligence. The appellate court held that the evidence was admissible to prove that an alternative design was feasible.

281 N.E.2d at 752. The court did not limit its holding, as the majority implies, to those cases in which feasibility is contested, and there was no indication in the case that feasibility was controverted. *Sutkowski* was so construed in *Ault*, 117 Cal.Rptr. at 816, 528 P.2d at 1152, and by this court in *Mahoney*, 490 F.2d at 232. In *Mahoney*, the trial court excluded evidence of subsequent design changes which, as in *Sutkowski*, apparently was offered as part of the plaintiff's case–in–chief. Finally, even if *Sutkowski* and *Mahoney* do not support *Burke*, recent Illinois cases clearly demonstrate Illinois adoption of the *Ault* position. In *Smith v. Verson Allsteel Press Co.*, 74 Ill. App.3d 818, 30 Ill.Dec. 562, 393 N.E.2d 598 (1979), the plaintiff recovered from the manufacturer on a strict liability theory. On appeal, the defendant argued, *inter alia*, that the trial court erroneously admitted evidence of subsequent design changes. The appellate court rejected this argument, saying that the rule excluding such evidence was inapplicable to strict liability actions. 30 Ill.Dec. at 570, 393 N.E.2d at 606.[9] *See also Christopherson v. Hyster Co.*, 58 Ill.App.3d 791, 16 Ill.Dec. 83, 374 N.E.2d 858 (1978).

In conclusion, because the proffered evidence was admissible and its exclusion greatly prejudiced Oberst, I would reverse the judgment against him and remand for a new trial.

---

**9.** Although the court also found that the defendant should have been allowed to explain that the changes were made for reasons other than safety, such error was deemed to be harmless.